J. E. LATHAM v. J. E. FIELD et als.

(Filed 5 November, 1913.)

1. Principal and Agent—Cotton Broker—Respondeat Superior.

A sale of cotton made by a broker in his own name, though in fact acting for his principal, will bind the latter, for the acts of the broker therein are imputable to the principal.

2. Same—Scope of Authority — Representations — Conduct—Good Faith.

Where a defendant has represented to the plaintiff that a certain agent or broker was authorized to act for him in the sale of cotton, and, reasonably induced by this representation, and by the acts of the principal and the broker or agent, the plaintiff purchased from the latter cotton of a certain grade, believing, in good faith, that he was dealing with him in his representative capacity only, the defendant would be bound by the transaction, though the broker or agent was acting independently in making the sale.

3. Principal and Agent — Cotton Broker — Scope of Authority — Trials—Evidence—Nonsuit.

When in an action to recover damages for the failure of cotton purchased and delivered to come up to the grade or quality of that purchased, the question has arisen as to whether the purchase was made of the defendant or of his broker or agent, acting independently, there was evidence tending to show, on behalf of the plaintiff, that the defendant solicited his trade for the purchase of cotton, and represented, in the presence of one T., that the latter was his agent in that territory for the sale of cotton, to which T. did not then or thereafter dissent; that subsequent to this statement, thus made by the defendant, the plaintiff bought from T. as agent or broker of the defendant the cotton in question, which defendant shipped to his own order, "Notify T.," indorsing the bill of lading, whereupon T. drew on the plaintiff, bill of lading attached, who paid the draft, and got the cotton several days thereafter, upon its arrival, in accordance with the established custom in such transactions, which provide that the consignee may receive the cotton from the carrier, subject to rejection by him if below the grade contracted for; that the transaction for the purchase of the cotton was confirmed by T., "for the account of Field & Son," the defendants, and that it was only the custom to ascertain the shipper's name in the bill of lading and his indorsement for delivery of the cotton, it being customary for the vendors of cotton to con-

sign it, in this manner, to third persons, in transactions of this character. *Held,* there was evidence sufficient to show that T., acting within the scope of his agency as the defendant's broker, was authorized to bind the defendant as principal to the transaction; and a motion to nonsuit upon the evidence was improperly allowed.

APPEAL by plaintiff from *Peebles, J.,* at April Term, 1913, of GUILFORD.

This case was before us at Fall Term, 1912, and is reported in 160 N. C., 335. The facts, as they now appear, are somewhat different from those there stated. Plaintiff testified that W. H. Field, one of the defendants, called at his place of business in April, 1908, and showed him some samples of cotton, stating that J. D. Turner would thereafter represent his firm in that territory as their broker, and he hoped plaintiff would send them some business through Mr. Turner; that about three weeks after the conversation, plaintiff ordered some cotton from the defendants through Turner, buying 100 bales of strict low middling from defendants through Turner, at 10⅛ cents per pound. Plaintiff paid for the cotton at that price, although it proved to be of a very low and inferior quality, below any known grade and what is called in the trade "junk." The difference in value of the two kinds is 2 cents per pound, and the quantity 46,493 pounds. That he had no further communication with defendants, personally or by letter, after the time of the conversation until the cotton had been shipped and received. He ordered the cotton through Turner, and at first wanted 200 bales, but Turner told him that he could only get 100 bales of the required grade and that he had secured it from defendants. The cotton was shipped to defendants, Greensboro, N. C., "order; notify J. D. Turner," and the bill of lading showed that the cotton was shipped by defendants to their own order, and indorsed by them. J. D. Turner drew the draft for the price, and plaintiff paid it at bank and took up the bill of lading. Draft was signed by Turner and drawn at Greensboro, N. C., and not by Fields & Co. at their home in Cartersville, Ga., as if it had originated there. Cotton is very often shipped through the south to the order of a bank cashier or some clerk in a merchant's office. "As to whose name is on a

bill of lading, that is a thing we don't look at. It is who is the shipper of the cotton and whose name is indorsed on the back that makes it negotiable." That he never found out what disposition was made of the proceeds of his payment for the cotton. That he paid the draft, and took the bill of lading to the railway company and got the cotton. He received the following letter confirming the trade:

Our order No. ......

MESSRS. J. E. LATHAM,          GREENSBORO, N. C., 5-11-1908.
      *Greensboro, N. C.*

DEAR SIRS :—We hereby confirm the following sale made you this day.

100 BALES COTTON.

Grade, strict low middling at 10⅙c. per lb., landed at Group A for shipment prompt. For the account of J. E. Field & Son.
REMARKS : Shipped by J. E. Field & Son, Cartersville, Ga.

Yours truly,<br>JOHN D. TURNER, JR.

N. B.—In any case of reference to this order, please give our order number, subject to Carolina mill rules.

On the cross- and reëxamination, plaintiff testified:

"Mr. Latham, on 19 June, 1908, you addressed a letter to Field & Co., which I have just shown you, and you told them about this offer you had received from the Riverside Cotton Mills of 10 cents? Answer: Yes, sir.

"Plaintiff did not address this communication to the defendants for the purpose of connecting them with the original sale, or for the purpose of getting some reply from defendants in order to connect them with the original sale. Plaintiff's reason for so writing the defendant was that cotton is sold in this territory, including Danville and all the territory around Greensboro, under what is known as the Carolina mill rules. These rules provide that when a shipment of cotton is received, if it is below grade as originally contracted for, it may be rejected by the buyer. Our position on this cotton all the time was that Field & Co. had not performed their contract; that

they had shipped something we did not buy, and, so far as we were concerned, we rejected it. We were holding the cotton, waiting for them to replace the contract with the proper grade of cotton which we had bought and which we had paid for. When he paid the draft drawn by Turner, for some $4,600, he knew that the draft had been drawn in Greensboro. He knew that a draft drawn by Field & Co. on him would have originated in Cartersville, Ga. In the former trial he testified that the cotton shipped was very difficult to grade, but in his opinion it would average about strict low middling. Cotton that is full of dust and sand is not merchantable, and for that reason is not gradable cotton. When cotton is bought, it is customary to confirm it. In this instance no confirmation was sent to the defendants, for the reason that plaintiff received a confirmation from J. D. Turner. Plaintiff confirmed the purchase to Turner. It is customary in the cotton trade to confirm either to the vendor or his agent. The sample exhibited to witness is a sample of strict low middling cotton. The sale in controversy was confirmed to plaintiff by J. D. Turner for the account of the defendants. Cotton arrives several days later than drafts, and in this instance the draft was presented and paid by plaintiff probably seven days before the arrival of the cotton. Plaintiff had no opportunity to examine the cotton before he paid the draft. That is the usual custom in the trade. He paid the draft upon the faith of the contract he had with Mr. Turner as broker for J. E. Field & Son, and upon the fact that it was attached to the bill of lading showing J. E. Field & Son, of Cartersville, Ga., were the shippers of the cotton, and that J. E. Field & Son, in order to make the bill of lading negotiable, had indorsed it on the back. He would not have paid the draft unless the bill of lading had been attached. The paper shown him is the confirmation he received at the time he bought the 100 bales of cotton in controversy."

The bill of lading was introduced. It was of the standard form, issued at Cartersville, Ga., by the railroad company to J. E. Field & Son, and contained the following: "Shippers' order, notify. Consignee, J. D. Turner, Jr.," and was in-

dorsed by J. E. Field & Son and J. D. Turner, Jr. There was more evidence as to the damages, not necessary to be stated. At the close of the plaintiff's testimony, the judge ordered a nonsuit, upon defendant's motion, and plaintiff appealed.

*Thomas S. Beall and King & Kimball for plaintiff.*

*Douglas & Douglas, J. T. Norris, and R. C. Strudwick for defendant.*

WALKER, J., after stating the case: The nonsuit requires us to consider the evidence in the most favorable view for the plaintiff. Plaintiff contends that he acted upon the representation of W. H. Field, that J. D. Turner was the broker of defendant, and therefore fully authorized to make contracts for the sale of cotton in their behalf, and that he was dealing with Turner as agent, and not in his individual capacity, and relied upon the statement of W. H. Field that he could so deal in the future.

The rule in regard to agency may be thus stated: A principal is bound by the acts of his agent within the authority he has actually given him, which includes not only the precise act which he expressly authorizes him to do, but also whatever usually belongs to the doing of it, or is necessary to its performance. Beyond that, he is liable for the acts of the agent within the appearance of authority which the principal himself knowingly permits the agent to assume, or which he holds the agent out to the public as possessing. For the acts of his agent, within his express authority, the principal is liable, because the act of the agent is the act of the principal. For the acts of the agent, within the scope of his authority he holds the agent out as having, or knowingly permits him to assume, the principal is made responsible, because to permit him to dispute the authority of the agent in such cases would be to enable him to commit a fraud upon innocent persons. *Bank v. Hay,* 143 N. C., 326; *Law v. Stokes,* 3 Vroom (N. J.), 249; Mechem on Agency, sec. 84. "The principal is bound by all the acts of his agent within the scope of the authority which he holds him out to the world to possess, although he may have

given him more limited private instructions, unknown to the persons dealing with him; and this is founded on the doctrine that where one of two persons must suffer by the act of a third person, he who has held that person out as worthy of trust and confidence, and as having authority in the matter, shall be bound by it." *Carmichael v. Buck,* 10 Rich. Law, 332 (70 Am. Dec.; 226); Story on Agency, sec. 127. "Where a person by words or conduct represents or permits it to be represented that another person is his agent, he will be estopped to deny the agency as against third persons who have dealt, on the faith of such representation, with the person so held out as agent, even if no agency existed in fact." *Trollinger v. Fleer,* 157 N. C., 81; *Metzger v. Whitehurst,* 147 N. C., 171. These cases fairly illustrate this doctrine and define its limits.

As to the liability of a principal acting through a broker, see 19 Cyc., p. 292.

The Court, in this case, when formerly here (160 N. C., 335), stated the duties of a broker and the nature of his agency.

The case may be considered in two aspects:

1. Was Turner, in fact, acting as defendant's broker in the transaction?

2. Did defendants, by W. H. Field, induce the plaintiff to believe that Turner had authority to represent them in selling their cotton, and thereby lead him to make the order for the 100 bales, he believing, and having reason to believe, under the circumstances, that they were selling, not to Turner for himself, but through him to the plaintiff?

If the jury should find that Turner was really acting as agent or broker for the defendants, they would be liable for the damages sustained by the plaintiffs, for the defendants would, in such case, be the principals and the acts of Turner, though in his own name, would be imputable to them as much so as if they had acted for themselves instead of by representation. The form of the transaction is not material. *Holt v. Wellons, ante,* 124.

We think there was evidence to support either of these theories. In the first place, the plaintiff testifies, without qualification, that "he got the cotton from the defendants through

Turner," and thus he did precisely what W. H. Field told him to do. It also appears that Turner told the plaintiff that he had succeeded in getting the cotton for them from defendants. In the letter of confirmation it is stated that "the sale was made for the account of J. E. Field & Son," and Turner opens his letter by saying: "We hereby confirm the sale, and request plaintiff, in case of any reference to the order, to give *our* order number." Plaintiff might well argue, and the jury be authorized to find, that Turner, by the use of this language, was not referring merely to himself, but to Field & Son, or to them and himself as their agent. Turner knew of the conversation that W. H. Field had with the plaintiff, for he was present, and it might reasonably be inferred by the jury that as he had not disavowed his agency or notified plaintiff to the contrary, up to the time of the purchase, he was acting for them in accordance with the understanding at the April meeting. The plaintiff testified that cotton is very often shipped to the order of a bank cashier or some clerk in a merchant's office. The name on the bill of lading is disregarded; they look for the shipper of the cotton and the indorsement on the bill. This was an explanation of the form of the bill of lading, and a reason why the request to notify J. D. Turner of the shipment did not necessarily disprove his agency, or establish the fact that defendants were dealing with him as a principal in the transaction and as a purchaser of the cotton, and its consignee, on his own account. If by the conduct of W. H. Field, or the defendants, the plaintiff was reasonably led to believe that Turner was acting as their broker, and by reason thereof he dealt with him as such, relying upon such conduct and believing in good faith that Turner was acting as broker and not for himself, it would be the same as if he was, in fact, the broker of defendants in selling the cotton.

The jury may consider whether Turner was in fact defendant's broker, and in the bill of lading they requested that he be notified individually of the shipment, merely for their convenience or in accordance with the custom, or whether they, thereby, intended to deal with him individually and not as their broker, or whether they used his name, meaning that he

should be their broker, without regard to the fact that he was not addressed as such and knowing that he had been so represented to the plaintiff. These are merely suggestions as to the different views of the evidence, and must not be taken as an intimation upon the weight or sufficiency of the same to establish either side of the case.

It would serve no practical purpose to further consider the evidence as bearing upon the question of an agency in fact or in law. It is sufficient to say that, as the case is now presented to us, there is evidence fit to be submitted to the jury and to warrant a finding thereon in favor of the plaintiff, under proper instructions from the court as to the law.

There was error in granting the nonsuit. It will be set aside, and a new trial is ordered.

New trial.