Two actions were brought before a justice of the peace, one to recover a balance of $50 due for goods sold by plaintiff to the defendant *Page 539 
Southern Furniture Company on 19 August, 1913, and the other to recover $200, a balance due for goods sold by plaintiff to said company in November, 1913. The cases were consolidated in the Superior Court and tried together, defendant T. T. Frazier having appealed from the judgments of the justice to that court.
The jury returned the following verdict:
1. Was the partnership composed of T. T. Frazier and P. M. Bussell dissolved on or about 26 August, 1913? Answer: "Yes."
2. Was the plaintiff duly notified of such dissolution before (475) the purchase of the property in controversy? Answer: "No."
3. Is the defendant T. T. Frazier indebted to Ring Furniture Company, and, if so, in what amount? Answer: "Yes; $200, less credit of $50."
4. Did the plaintiff receive actual notice of the retirement of T. T. Frazier from the defendant partnership, and, if so, was such notice given prior to 16 December, 1913? Answer: "No."
5. Did the plaintiff accept one or all of the notes offered in evidence in payment of the $50 account? Answer: "No."
The defendant Frazier denied his liability to plaintiff as to the $50 account, upon the ground that he had been relieved and discharged by certain dealings and transactions between his codefendants and the plaintiff by which the latter agreed to receive a stipulated sum, less than the full amount of the account, in full payment and satisfaction of the same, plaintiff contending that the said sum and note were received with the express reservation of their right to sue the appellant, and that this was well understood at the time of the settlement. The Southern Furniture Company, in August, 1913, was the name of a partnership composed of defendant T. T. Frazier and P. M. Bussell, trading and doing business under that name. On 26 August, 1913, defendant T. T. Frazier retired from the firm and a new partnership was formed, composed of P. M. Bussell, J. L. Austin, and C. P. Watson, three of the original defendants in these suits, and they continued in the same kind of business as that which had theretofore been conducted by Frazier and Bussell, and under the same firm name. A. H. Holland was traveling salesman of the Forsyth Furniture Company, which sold goods for the plaintiff Ring Furniture Company, through the Forsyth Chair Company.
Mr. Fulp, secretary and treasurer of the plaintiff, testified: "Mr. Holland made the sales to the Southern Furniture Company for us."
Q. Mr. Fulp, did you employ a traveling salesman to represent your company? A. Our method of selling goods was through the sales department of the Forsyth Chair Company. We have a combination *Page 540 
whereby Forsyth Chair Company of Winston-Salem charges to the different factories a certain commission for selling goods.
Q. Did you furnish to the Forsyth Chair Company information as to your stock and price list? A. Do you mean the goods I manufacture and price list of these goods? If so, I will say yes. He has a set of photographs and price list. These photographs were made up by my company. They were photographs of our stock, showing style and cut of various articles of furniture that we manufacture and sell. The photographs and price list are designed for the use of salesmen in making sales for my company.
(476) Q. Did you have a salesman that had one of these photographs and price list representing your company in 1913? A. Yes; Mr. Holland for this immediate territory right here.
Q. He was for Durham territory? A. Yes.
Q. Did you ever come and make any sales in Durham? A. Yes; I have made a few sales in Durham; but I do not recall that I ever made any to the Southern Furniture Company myself. Mr. Holland, or whoever had this catalogue and price list of my company, was authorized to take orders for the company. He was a traveling salesman. I never had any conversation with T. T. Frazier and know nothing about him of my own knowledge. . . . The Forsyth Chair Company is a separate corporation from my concern. They employ the salesmen, pay them salaries and expenses, and our part of it is to pay into that office a certain commission on the goods sold by their salesmen and shipped by us. We do not pay the salesmen one cent. It is all paid by the Forsyth Chair Company. We have nothing whatever to do with the selection of the salesmen who represent my company. This man Holland was sent out by the Forsyth Chair Company, and I had no contract with him myself. I had a contract with the Forsyth Chair Company that their employee was to represent us on the road. I have a copy of their contract if you desire to see it. Mr. Holland has represented our company through the Forsyth Chair Company in this territory since the organization in 1910. I think 1910 was the first year we had a contract with the Forsyth Chair Company. The Forsyth Chair Company under the agreement had nothing whatever to do with the credit department of my company. It was Mr. Holland's duty to solicit business for us in the territory allotted to him by the Forsyth Chair Company, and for his services we paid the Forsyth Chair Company a certain percentage on the amount of goods shipped at the end of each month, and as far as our shipping all orders he took, we were not forced to do it, only such orders as we considered the financial standing of the party made satisfactory. All rejected orders had to be returned within a limited time, or they claimed commission on them. *Page 541 
We were not required to accept an order that was not sold on our regular price list or regular terms either. We had a right to reject such orders as that. Those orders go through the chair company office and are then forwarded to us, together with orders of the other salesmen. I pass on all credits at our factory myself. I passed on the credit of the Southern Furniture Company. (Order No. 1124 and Order No. 1311 shown to witness.) They are the original invoices. They purport to have been taken by Mr. Holland. They are my bills from the office. They were made from the order sent in by Mr. Holland. These orders covered the particular property in controversy. Mr. Holland has collected unpaid balances for us in a few (477) instances, but that is not a part of his duties."
A. H. Holland testified: Q. Were you representing the Ring Furniture Company through the Forsyth Chair Company? A. Yes, sir.
Q. Were you representing Forsyth Chair Company at the times these bills were contracted? A. I was representing the Ring Furniture Company through the Forsyth Chair Company. The Ring Furniture Company did not pay me a per cent direct. The contract was made between me and the Forsyth Chair Company. My duty with respect to Ring Furniture Company was to offer their goods for sale and sell them if I could. I sold other goods besides those of Ring Furniture Company. I guess at one time I had as many as twenty or more. I would pick up a side line. A man selling Furniture tries to supply his customers with anything he wants. I would be called, strictly speaking, a commission salesman, as far as the Ring Furniture Company was concerned; but I would not as far as Forsyth Chair Company was concerned. One is direct and the other indirect. I had nothing to do with the credit department of the Ring Furniture Company. My duty consisted in soliciting and taking orders, and I sent them to Forsyth Chair Company and they sent them to the Ring Furniture Company. They had a right to send it or reject it. It was to my interest to take as many orders as possible. I do not make it a practice to investigate the credit of purchasers. I would not sell a man that I knew was not solvent. I do not make it a point to look up the credit. That is not my business. I am a traveling salesman. I was a traveling salesman for the Ring Furniture Company indirectly, not directly. I am not in the employ of them. I got a commission on things sold from the Ring Furniture Company. I solicited orders for them. I do not recall collecting any account for them. I may have done so at special request of Ring Furniture Company. I may have collected from the Chatham Furniture Company for the Forsyth Chair Company, but if I did for the Ring Furniture Company, it was by special request from them, and they would send me the bill to collect it. I do *Page 542 
not recall any special instance, and will not say that they did it. I say I would have done so, but do not recall any special instance. I suppose I took the orders of 19 August and 29 November. I sold to Southern Furniture Company two bills. I cannot tell whether these are the ones. I should say the first was sold somewhere about four weeks prior to 19 August. I sent orders to Forsyth Chair Company. In pursuance of the order, goods were delivered here in Durham. That is the stuff in controversy, I presume. . . . When I sold this last bill I had photographs of the different articles I was offering for sale. I had a price list and photographs. It is practically the same thing as (478) a catalogue. I cannot say whether Mr. Bussell told me Dr. Frazier was not in the business at the time I took the last orders. I came in possession of those facts some time, but I could not say whether it was prior or some time afterwards. I could not say when it was I learned this.
P. M. Bussell, witness for defendant, testified: "I am engaged in the furniture business and have been since 1912. Dr. T. T. Frazier and myself formed a partnership about March, 1912. We were engaged in the furniture business. The partnership began buying goods of the Ring Furniture Company in 1912. We ordered goods from the Ring Furniture Company in 1913. One order was for 19 August, 1913. These are the invoices for the goods purchased by the Southern Furniture Company from the Ring Furniture Company. (Invoices exhibited.) . . . I gave these orders to Mr. Holland, and selected the style and grade of furniture wanted. He took the orders away with him. The furniture came in accordance with the terms of the orders from the Ring Furniture Company. Payments have been made on this account. The first payment was with a note and check, as well as I remember. . . . I gave Mr. Holland the order dated 29 November, possibly about the middle of November. The furniture was shipped later. The Ring Furniture Company sent me the furniture on that bill. I selected the stuff from Mr. Holland. I had bought furniture from Mr. Holland — from the Ring Furniture Company — on an average possibly of once a year. The partnership existing between Dr. Frazier and myself was dissolved on 26 August, 1913. I published notice of the dissolution in the Durham Sun. I told Mr. Holland that Dr. Frazier was out of the firm, but I didn't give him written notice. This was possibly the middle or latter part of September; I would say about 20 September, 1913. I told him also when I bought that car in November that you have reference to in this second deal. . . . I published notice in the Durham Sun. I did not mail a copy of it to any one. The only notice the Ring Furniture Company had of the dissolution of the partnership was what I told Mr. Holland. I do not *Page 543 
know whether any commercial agency actually got notice of the dissolution. Mr. Holland was representing several furniture companies. He represented a good many of them as salesman. The only way the Ring Furniture Company could get word about this dissolution was through Mr. Holland. He represented these furniture companies as commission salesman. He told me he worked for the Forsyth Chair Company. I talked with Mr. Holland in September, 1913. That was after the $50 account had been made and before it was due. I told him positively that I had bought Dr. Frazier's interest in the partnership. He went to dinner with me, and we discussed it all the way back. I did not buy anything from him on that trip. My sister (479) was with us going to dinner. I do not suppose any one else heard the conversation. We were on the street. I bought another bill of furniture from him in November. I told him then that Dr. Frazier was out of the partnership. I did not tell the Ring Furniture Company. I never sent any notice to the Ring Furniture Company direct. I have been seeing Mr. Holland here a good many times. He never made inquiry as to my financial rating. He always solicited my orders and sent them in. That was about all he did, so far as I know.
Q. Did he have anything to do with the taking of these notes? A. No; but he assured me they would be absolutely all right to take them when he sold me this second car. I hesitated buying a car, from the fact that I was afraid we would not be able to take care of it when it became due, and he assured me they would take our notes. I told him I was afraid they would want Dr. Frazier to indorse them, because we were going on our own feet, and he assured me they would take my notes as quick as they would Dr. Frazier. I do not know that I had any conversation with him prior to November, in the way of discussing notes.
Q. The Ring Furniture Company did not know Dr. Frazier was out of partnership, did they? A. Mr. Holland always told me if there was any time they did not want to renew the note or extend it, to take it up with him, and he would see that it was all right.
Q. Didn't he tell you he knew they would be accepted, because that was customary for these wholesale houses to extend credit in that way to these installment dealers? A. No; on the other hand, he told me that most of them would not do it. I do not know whether it is the custom or not with all of them.
There was other evidence in the case, but that which we have recited is sufficient for an understanding of the questions decided. The court instructed the jury to answer the second and fourth issues "No," and defendant excepted. As to the fifth issue, the court charged the jury that the defendant would not be relieved of liability for the $50 *Page 544 
account "unless the notes were accepted in full settlement and discharge of the original account or unless they were satisfied from the evidence that the Ring Furniture Company took the notes in settlement of the account and with knowledge of Dr. Frazier's retirement from the Southern Furniture Company." Defendant excepted.
There was a judgment upon the verdict for the plaintiff, and an appeal by the defendant.
(480) After stating the case: It may be conceded that an outgoing member of a firm should take his name out with him, for if he leaves it behind he will be considered as still holding himself out as a partner, whatever may be his real relation to the firm, unless he gives notice of his withdrawal to those who dealt with the firm or were its customers while he was a partner. Straus v. Sparrow, 148 N.C. 309; George on Partnership, 261 and 407.
The question for our consideration is whether the notice to A. H. Holland, the traveling salesman, was sufficient in law to fix the plaintiff with notice of the retirement of the defendant T. T. Frazier from the firm of which he had been a member, and which was succeeded by the new firm, composed of different members, but which continued to conduct a like kind of business under the same name. This depends again upon whether it was within the scope of Holland's agency to receive the notice and his duty to communicate it to the plaintiff, either directly or indirectly through the Forsyth Furniture Company.
Mechem on Agency, sec. 721, lays down the following rule:
"The law imputes to the principal and charges him with all notice or knowledge relating to the subject-matter of the agency which the agent requires or obtains while acting as such agent and within the scope of his authority or which he may previously have acquired, and which he then had in mind, or which he had acquired so recently as to reasonably warrant the assumption that he still retained it. Provided, however, that such notice or knowledge will not be imputed (1) where it is such as it is the agent's duty not to disclose, and (2) where the agent's relation to the subject-matter or his previous conduct render it certain that he will not disclose it, and (3) where the person claiming the benefit of the notice, or those whom he represents, colluded with the agent to cheat or defraud the principal."
This statement of the law was affirmed in Jenkins v. Renfrow,151 N.C. 323. *Page 545 
It will be convenient to determine, in the beginning, whether Holland was such an agent, being what is know as a "commercial traveler" and taking orders for the sale of goods, without regard to his special relation to the Forsyth Chair Company and the plaintiff.
In Cox v. Pearce, 112 N.Y. 637 (s. c., 3 L.R.A., 563), cited and approved by this Court in Straus v. Sparrow, supra, four propositions were decided:
1. The failure of an agent to communicate to his principal information acquired by him in the course and within the scope of his agency is a breach of duty to his principal; but as notice to the principal it has the same effect as to third persons as though his duty had been faithfully performed.
2. If a person gives notice of his withdrawal from a firm to an (481) agent with authority to receive orders for an article, when the latter seeks from him, as a supposed partner, an order from the firm for such article, it is of no consequence, so far as the effect of the notice is concerned, that on a subsequent sale to a new firm of the same name the agent had forgotten the notice.
3. Notice to a party, actual or constructive, in a particular transaction, of a fact which exempts another from liability in that transaction is notice in all subsequent transactions of the same character between the same parties.
4. Notice to a special representative for procuring orders for coal from a firm who acts exclusively in the interest of certain dealers, and who has previously procured orders from the firm, on soliciting another order, that one of the former members of the firm had withdrawn, constitutes notice to the dealers whom he represents.
The case of Ach v. Barnes, 53 S.W. (Ky.), 293, held that notice to plaintiff's traveling salesman (at the time he sold the goods) that defendant had withdrawn from a firm to which the salesman had sold the goods for the plaintiff was notice to the plaintiff, so as to relieve the defendant from liability for the price of the goods sold. The Court there said, at page 294: "When an ostensible partner retires from the firm, he must give notice of his retirement to those who have had dealings with the firm in order to avoid future responsibility, or must show actual knowledge on their part, or adequate means of knowledge that the firm no longer exists; but it is not important in what manner the notice is given. SeeMitchum v. Bank, 9 Dana, 166; Gaar v. Huggins, 12 Bush., 261; Pars. on Partn., p. 412, and Collyer Partn., p. 1059. And notice to the agent in reference to or in connection with any business in which the agent is engaged by authority of the principal, and where the information is so important a fact in the transaction as to make it the duty of the agent to communicate it to the principal, is, *Page 546 
in contemplation of law, notice to the principal, upon the theory that it is the agent's duty to communicate to his principal knowledge which he has respecting any business in which he is engaged for the principal; and the presumption is that he will perform his duty." And again: "We are of the opinion that if information of the dissolution of the partnership was actually communicated to the salesman of appellants at the time of or before the sale of the goods, it is, in contemplation of law a sufficient notice thereof to appellants." See, also, Straus v. Sparrow,supra; Jenkins v. Renfrow, supra, and Cowan v. Roberts, 133 N.C. 629, where it was said: "Of course, if any salesman had been notified of the dissolution of the firm, and he had afterwards sold goods to Roberts, (482) Redmond (the partner who had retired) would not have been liable."
The rule which imputes to the principal the knowledge possessed by the agent, and the extent of it, applies, as has been well said, only to cases where the knowledge is possessed by an agent within the scope of whose authority the subject-matter lies; in other words, the knowledge or notice must come to an agent who has authority to deal in reference to those matters which the knowledge or notice affects. The facts of which the agent had notice must be within the scope of the agency, so that it becomes his duty to act upon them or communicate them to his principal. As it is the rule that whether the principal is bound by contracts entered into by the agent depends upon the nature and extent of the agency, so does the effect upon the principal of notice to the agent depend upon the same conditions. Hence, in order to determine whether the knowledge of the agent should be imputed to the principal, it becomes of primary importance to ascertain the exact scope and extent of the agency. Trentor v. Pothin, 46 Minn. 298
(24 Am. St. Rep., 225), op. by Mitchell, J.
It has been held by this Court that whether one is entitled to represent another as his agent, and thus to bind the principal by his conduct, is to be determined not by the descriptive name employed, but by the nature of the business and the extent of the authority given and exercised, and that such agent is not any subordinate employee without discretion or power to act in the particular matter, but must be one regularly employed, having some charge or measure of control over the business intrusted to him, or of some part of it, and of sufficient character and rank to afford reasonable assurance that he will communicate the fact in question to his employer.Whitehurst v. Kerr, 153 N.C. 76, 80.
If an agent acquires knowledge of a fact which it is important that his principal should know in reference to a particular matter, and while engaged in the transaction to which the fact related, it would seem to be *Page 547 
his duty to make it known, so that the principal can act intelligently and advisedly in regard to it; for otherwise he might be seriously prejudiced by the agent's silence.
It would follow that if Holland was acting as salesman for the plaintiff when he sold the last bill of goods to the new firm, trading as Southern Furniture Company, he was under the duty to apprise it of what had been said to him by Bussell as to the withdrawal of defendant from the firm. We do not see why the fact that plaintiff had a rating book and passed upon all orders should alter the case. In the first place, this was not known to the Southern Furniture Company, and, for all that appeared to this firm at the time, Holland rated (483) the plaintiff's customers with whom he dealt, and he was, therefore, the one, as Bussell evidently thought, to be informed of the change in the firm, so that he might communicate the fact to his principal. If the plaintiff had a rating list and passed upon the orders, it does not appear to have done so in this particular instance, and was actually misled by the failure of Holland to perform his duty, showing by practical illustration the fairness and reasonableness of the rule.
The next question is whether Holland's special connection with the Forsyth Chair Company and his consequent relation to the plaintiff prevents the application of the usual rule to this case. We have already stated that, so far as appeared to the Southern Furniture Company, Holland represented the plaintiff, or, at least, there is evidence tending to show this as a fact. He had photographs of plaintiff's goods and its price lists, which was the same as a catalogue; and M. V. Fulp, plaintiff's secretary and treasurer, testified: "Mr. Holland, or whoever had this catalogue and price list of my company, was authorized to take orders for the company. He was a traveling salesman. . . . I had a contract with the Forsyth Chair Company that their employee was to represent us on the road." It is true, there is evidence which tends to show that Holland was employed by the Chair Company, but he also represented the plaintiff, according to some of the testimony. But suppose he was a subagent as to the plaintiff, or represented it, not directly, but through the chair company. Tiffany on Agency, p. 265, says: "If an agent has authority to employ a subagent, it seems that the same principles must apply as to the notice to be imputed to the principal in cases of agents appointed by him directly, and that notice to the subagent of any fact material to the business which he is authorized to transact is notice to the principal. This rule is frequently applied in cases of subagents appointed by insurance agents. Nor would it seem to be material, so long as the agent had authority to appoint the subagent, whether privity of contract existed between him and the principal. If the principal is bound by his act, he should also *Page 548 
be charged by his knowledge." The author refers in the text and note toHoover v. Wise, 91 U.S. 208, as being supposed to establish a contrary doctrine; but that case is not like this one, and the opinion of the Court, even in that case, met with a strong dissent by three very able judges,Justices Miller, Clifford, and Bradley, the first of the three writing the dissenting opinion. The case, as a precedent, has also been doubted in other jurisdictions. The evidence in this case, though, presents a question very different from the one considered there.
The Court, in Bates v. Am. Mortgage Co., 37 S.C. 88, referring to the general rule we have stated, says: "It is insisted that the doctrine (484) does not apply when another or subagent, is introduced; that notice to the agent, but not to the subagent, will be imputed to their principal. There seems to be no case in our Reports upon that precise point, but I confess that I am not able to perceive the principle on which the alleged distinction rests, if both the agent and subagent are, as here, engaged in the same business for the principal, although it may be on different parts of that business. Such seems to be the general rule. Where an agent has power to employ a subagent, the acts of the subagent, or notice given to him, in the transaction of the business, have the same effect as if done or received by the principal. Sooy v. State,41 N.J.L. 394; Story Ag., secs. 452, 454. An attorney employed by an agent for his principal is the principal's attorney. Porter v. Peckham,44 Cal. 204." The case of Hoover v. Wise, supra, is there mentioned with apparent disapproval, but held to be distinguishable, even as it was decided.
It appears that Holland, the traveling salesman, collected for the plaintiff, or at least there is some evidence from which a jury could draw that inference, and there also is evidence that he had other financial relations with plaintiff, as he seems to have been able to procure extensions and like favors for its customers; and this would bring the case directly within the principle of the decision in Straus v. Sparrow, supra, and Jenkins v. Renfrow, supra, and would further indicate that he was not acting strictly as a subagent through his alleged principal, the chair company, but dealing directly with the plaintiff.
There is evidence from which a jury may infer that the plaintiff knew all along that Holland was selling its goods, although he was the salesman of the chair company. Even in Hoover v. Wise, supra, the Court said: "The general doctrine, that the knowledge of an agent is the knowledge of the principal, cannot be doubted. Bank v. Davis, 2 Hill, 451; Ingalls v.Morgan, 10 N.Y. 178; Fulton Bank v. N.Y. and S. Can Co., 4 Paige, 127. It must, however, be knowledge acquired in a prior transaction then present to his mind, and which could properly be communicated to his principal. TheDistilled Spirits, 11 Wall., *Page 549 
356, 20 L.Ed., 167; Ingalls v. Morgan, supra. Neither can it be doubted that where an agent has power to employ a subagent, the acts of the subagent, or notice given to him in the transaction of the business, have the same effect as if done or received by the principal. Story Ag., secs. 452, 454; Storrs v. Utica, 17 N.Y. 104; Boyd v. Vanderkamp, 1 Barb. Ch., 273; Rourke v. Story, 4 E. D. Smith, 54; Lincoln v. Battelle, 6 Wend., 475. The rule of law is undoubted that for the acts of a subagent the principal is liable, but that for the acts of the agent of an intermediate independent employer he is not liable. It is difficult to lay down a precise rule which will define the distinctions arising in such cases. The application of the rule is full of embarrassment. (485) For a collection of the cases and illustrations of the doctrine, reference may be had to Story on Agency, sec. 454, and following." And, referring to Story on Agency, sec. 454, we find it stated that the principal is represented not only by the person who is immediately employed in the business, but also by others employed by that agent under him or with whom he contracts for the performance of the business, and will be responsible for his acts done within the scope of his agency.
This case differs from Hoover v. Wise essentially in this respect, that plaintiff contracted with the chair company that the latter should sell its goods through its own salesmen, they being to some extent engaged in the same line of business, and while there is evidence that plaintiff retained the right to pass upon the sales and to investigate the financial credit of customers, however the authority of Holland may have appeared to the Southern Furniture Company, whether restricted or not, the latter was not bound by secret instructions to Holland, not known to them, but had the right, in the exercise of good faith and due prudence, to act upon his apparent authority, as held in Bank v. Hay, 143 N.C. 326; Stephens v.Lumber Co., 160 N.C. 107; Latham v. Field, 163 N.C. 356; Wynn v. Grant,166 N.C. 39; Powell v. Lumber Co., 168 N.C. 632. There is evidence in this case that the chair company was not an "intermediate independent employer" of Holland, as the attorney was held to be in Hoover v. Wise,supra, but was something more, as there is some evidence to show, being engaged by the plaintiff as agent to sell its goods; and, further, the understanding was that the chair company would make the sales through its own salesmen. This view is sustained by what was held in Cox v. Pearce,112 N. Y., 637, 3 L. R. Anno at p. 364, where the Court said: "We are of the opinion that the relation of Marriott to Cox and Boyce was such as to charge that firm with the notice given to Marriott in 1878, by Hosea O. Pearce, of his withdrawal from the firm of Pearce Hall. The notice was material to the very negotiations in which Marriott was then *Page 550 
engaged, and it was his duty to inform Cox and Boyce of the information he received, because it was a material fact bearing upon the question whether they should fill the order then made. Marriott, in his dealings with Pearce Hall, was not acting simply as a broker in the general sense. In receiving orders from Pearce Hall, he was acting exclusively in the interest of Cox and Boyce, and it was so understood by the vendor and purchaser. Cox and Boyce permitted him to exercise powers, limited, it is true, but such as are usually exercised by agents. The occasion called for the notification given by Pearce to Marriott. The application for another order was made to the (486) former, according to the course of business prior to that time, and good faith required Pearce to make the disclosure; and we think he had a right to assume that it was within the scope of Marriott's agency to receive it in behalf of his principals."
We do not decide that notice to Holland as to the withdrawal of defendant from the firm is to be imputed to the plaintiff as matter of law, but that there is evidence for the jury to consider upon that question, and as the court peremptorily instructed against the defendant on that point, and as we think the instruction was calculated to prejudice the defendant upon the essential matters, a new trial is granted as to all the issues.
New trial.
Cited: Chesson v. Cedar Works, 172 N.C. 34 (2e); Hunsucker v. Corbitt,187 N.C. 503 (2c); Bobbitt v. Land Co., 191 N.C. 328 (2c); Corporation v.Cooper, 194 N.C. 560 (1c); Bank v. Sklut, 198 N.C. 593 (2c); Austin v.George, 201 N.C. 381 (1c); R. R. v. Lassiter Co., 207 N.C. 414 (2c);Warehouse Co. v. Bank, 216 N.C. 253 (2c); Service Co. v. Bank, 218 N.C. 537
(2e).