WILLIAM WOOD JOHNSON AND WIFE, SUZANNE WAYNE JOHNSON, PLAINTIFFS v. TIMOTHY P. SCHULTZ AND WIFE, SHELLEY D. SCHULTZ, DONALD A. PARKER, JERRY HALBROOK, TRUSTEE, AND STATE FARM BANK, F.S.B., DEFENDANTS

No. COA08-133

(Filed 3 February 2009)

**1. Appeal and Error— appealability—appellate rules violations**

Although defendants contend plaintiffs' appeal should be dismissed based on their failure to comply with N.C. R. App. P. 28(b)(6), the Court of Appeals declined to address this argument because: (1) the record on appeal contained no motion to dismiss filed in accordance with N.C. R. App. P. 25 and 37; and (2) plaintiffs presented sufficient legal argument to comply with N.C. R. App. P. 28(b)(6).

**2. Attorneys; Real Property— breach of contract—attorney malpractice—misappropriation of closing funds by attorney—fault—innocent parties—allocation of risk of fault**

The trial court erred in a breach of contract case arising out of the misappropriation of closing funds by an attorney in a residential real estate sale by granting summary judgment in favor of defendant buyers, and the case is remanded to the trial court with instructions to consider whether the attorney acted as plaintiffs' attorney as well as the attorney for defendants and whether plaintiffs must share the loss, because: (1) the arrangement did not constitute an escrow and there was no fault, and thus, in accordance with equity the risk of loss should fall on those parties who had an attorney-client relationship with the wrongdoing attorney; (2) even assuming arguendo that the arrangement between the parties was an escrow, where there is no fault and the buyer and seller are essentially innocent parties, the risk of loss should be allocated based on the attorney-client relationship; (3) it cannot be said that but for plaintiff sellers' failure to cash the trust account check until May 2006, the attorney could not have stolen the trust monies since he had already misappropriated them; and (4) defendants admitted that the attorney acted as their attorney, and thus defendants must bear some portion of the loss.

Judge WYNN dissenting.

*JOHNSON v. SCHULTZ*

[195 N.C. App. 161 (2009)]

Appeal by plaintiffs from judgment entered 18 October 2007 by Judge Jack A. Thompson in Johnston County Superior Court. Heard in the Court of Appeals 18 August 2008.

*Woodruff, Reece & Fortner, by Gordon C. Woodruff, for plaintiff-appellants.*

*Pendergrass Law Firm, PLLC, by James K. Pendergrass, Jr., for defendant-appellees.*

*Horack Talley Pharr & Lowndes, P.A., by Robert B. McNeill and Phillip E. Lewis, amicus curiae for The North Carolina Land Title Association.*

*Katherine Jean and David R. Johnson, amicus curiae for The North Carolina State Bar.*

HUNTER, Robert C., Judge.

In this case we consider who, between buyer and seller, bears the risk of loss in a residential real estate sale where the attorney who handled the closing misappropriated the remaining sales proceeds owed to the sellers from his trust account.[1] The trial court resolved this issue against plaintiff-sellers, William Wood Johnson and Suzanne Wayne Johnson ("the Johnsons") on summary judgment. After careful review, we reverse and remand.

## I. Background

On 17 November 2005, defendant-buyers Timothy P. and Shelley D. Schultz ("the Schultzes") entered into a written contract with the Johnsons to purchase their residential property located at 502 West Woodall Street ("West Woodall property") in Benson, North Carolina, for $277,500.00. The parties utilized the North Carolina Bar Association's 2005 standard "Offer to Purchase and Contract" form ("NCBA Contract"). The Schultzes hired defendant-attorney Donald A. Parker ("Mr. Parker") to represent them in closing the transaction. Mr. Parker conducted the closing and was the only attorney involved in the closing.

---

1. While plaintiff-sellers also sued defendant-lender State Farm Bank, FSB ("State Farm Bank") and defendant-trustee Jerry Halbrook ("Mr. Halbrook"), they make no argument as to these parties' liability on appeal and argue solely that defendant-buyers are liable for the closing attorney's misappropriation. Similarly, defendant-buyers make no argument as to those defendants' liability. Accordingly, whether the other original defendants bear or share the risk of loss is not before us.

The closing occurred at Mr. Parker's office on 3 January 2006. As part of the closing process, Mr. Parker drafted a deed to the West Woodall property for the Johnsons in exchange for a $125.00 fee. The Schultzes provided $76,933.56 of their personal funds toward the balance of the purchase price and obtained a loan from defendant State Farm Bank for the remainder ($200,320.24). These funds were deposited into Mr. Parker's trust account prior to closing.[2] During the closing, the Johnsons executed a deed to the West Woodall property to the Schultzes. The deed and deed of trust were recorded at 4:46 p.m.; in addition, Mr. Parker tendered a check, drawn from his trust account, to the Johnsons for the net proceeds due ($262,881.38).

On 3 January 2006, Mr. Parker's trust account contained sufficient funds to cover the check. However, on 4 January 2006, his trust account did not have sufficient funds as he had misappropriated them. The Johnsons did not try to cash the check until May 2006; the check bounced and was returned as "NSF" (non-sufficient funds). At the time they filed this appeal, the Johnsons still had not received the remaining money owed to them for the West Woodall property.

The Johnsons filed suit asserting breach of contract against the Schultzes, Mr. Parker, State Farm Bank, and Mr. Halbrook. The Johnsons sought rescission of the deed and recovery of title to the West Woodall property, or in the alternative, monetary damages. In his answer, Mr. Parker admitted the Johnsons' material allegations. Both the Johnsons and the remaining defendants respectively moved for summary judgment. In its judgment, the trial court allowed defendants' motion, denied the Johnsons' motion, and dismissed the Johnsons' claim with prejudice. The court determined that the Johnsons had to "bear the risk of loss of the sales proceeds . . . resulting from the escrow agent, Defendant Donald A. Parker, having embezzled the [money] . . . [because] Plaintiffs were entitled to receive those sales proceeds at the time of such embezzlement." The court further concluded that "Defendants Schultz were lawfully vested with title to the [real] Property on January 3, 2006, the day before Defendant . . . Parker embezzled the . . . sales proceeds. Therefore, Defendants Schultz were entitled only to the [real] Property, [and] not [to] the embezzled sales proceeds, at the time of . . . embezzlement[.]" The court also quieted title to the West Woodall property in the Schultzes subject only to State Farm Bank's recorded deed of trust. The Johnsons appeal.

---

2. Mr. Parker's trust account records indicate that the funds from the Schultzes were credited to his account on 4 January 2006, and the funds from State Farm Bank were credited on 3 January 2006.

## II. Analysis

### A. Motion to Dismiss and Standard of Review

**[1]** At the outset, we address the section in the Schultzes' brief which asserts that the Johnsons' appeal should be dismissed due to the Johnsons' failure to comply with N.C.R. App. P. 28(b)(6). Since the record on appeal contains no motion to dismiss filed in accordance with Rules 25 and 37 of the North Carolina Rules of Appellate Procedure, we decline to address this argument as presented in defendant's brief. *E.g., Morris v. Morris*, 92 N.C. App. 359, 361, 374 S.E.2d 441, 442 (1988) (declining to address a motion to dismiss raised in the defendant's brief where the record contained no motion to dismiss filed in accordance with Rule 37); *see also State v. Easter*, 101 N.C. App. 36, 41, 398 S.E.2d 619, 622 (1990) (declining to address a motion to dismiss raised in the State's brief where the record contained no motion to dismiss filed in accordance with Rules 25 and 37). We also believe the Johnsons have presented sufficient legal argument to comply with N.C.R. App. P. 28(b)(6); accordingly, we address the merits of this appeal.

When ruling on a motion for summary judgment, the evidence must be considered in the light most favorable to the nonmoving party. *Roumillat v. Simplistic Enterprises, Inc.*, 331 N.C. 57, 63, 414 S.E.2d 339, 342 (1992). Summary judgment should only be granted if the moving party demonstrates there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *Id.* at 62, 414 S.E.2d at 341. Our review is *de novo. Forbis v. Neal*, 361 N.C. 519, 524, 649 S.E.2d 382, 385 (2007).

### B. "Typical" North Carolina Residential Real Estate Transaction

**[2]** Here, the residential real estate transaction between the Johnsons and the Schultzes reflects the manner in which the vast majority of residential real estate sales are conducted in this state, particularly the contract, closing method, and form of payment they used.

In a typical North Carolina residential real estate transaction, the buyer and seller execute the standard, pre-printed NCBA contract, which generally is provided to them by a real estate agent who is involved in the transaction. Edmund T. Urban and A. Grant Whitney, Jr., *North Carolina Real Estate*, § 26-1, at 653 (1996). "[I]t is common

for only one attorney to supervise and handle the entire closing process." Patrick K. Hetrick, Larry A. Outlaw, and Patricia A. Moylan, *North Carolina Real Estate Manual*, at 508 (North Carolina Real Estate Commission 2008-2009 ed. 2008). Although the attorney may be chosen by buyer, lender, or seller, "*[t]he most common practice is for the closing attorney to represent the [buyer] and lender while performing limited functions for the seller (such as preparation of the deed).*" *Id.*

> [While *a]ll parties to the real estate transaction have the right to select their respective attorneys independently* and the seller in a residential closing also may choose to have an attorney, . . . this is rare. By comparison, complex real estate transactions, including most commercial and industrial property closings, will involve individual attorneys for the seller and buyer.

*Id.*

In North Carolina, two basic methods are used for completing real estate transactions: The settlement closing and the escrow closing. *Id.* at 505. In an escrow closing:

> After the seller and [buyer] have entered into a sales contract, they also enter into an escrow agreement containing instructions to the escrow agent from both seller and purchaser. This agreement may bear any of a number of titles including but not limited to "Escrow Agreement," "Escrow Instructions," or "Deed and Money Escrow." The escrow agent . . . then performs the specified closing functions in accordance with the escrow agreement independently of any further control by either the seller or the [buyer]. The escrow agent of necessity must be a disinterested party. In areas where this type of closing is popular, title insurance companies and escrow divisions of lending institutions frequently serve as escrow agents. In North Carolina, law firms occasionally act as escrow agents.

> The seller and [buyer] must each furnish the escrow agent with all documents and other items necessary to complete the real estate transaction. For the seller, this [typically] means the deed . . . . The [buyer's] chief obligations are to deliver an acceptable check for the balance of the purchase price and to execute all documents necessary for financing the purchase. When both parties have complied with the escrow agreement [terms] . . . the escrow agent will complete the transaction after first verifying by

an updated title search that the seller's title conforms to the contract terms and that the [buyer's] check is valid.

*Id.* at 506.

However, as with the parties here, the vast majority of real estate closings in North Carolina are conducted via the settlement closing method. *Id.* at 507. Typically, in a settlement closing, the "closing attorney . . . conduct[s] the closing in accordance with the provisions of the sales contract and the detailed instructions provided by the buyer's lender." *Id.* at 509. In the instant case, the record contains no closing instructions from the lender. Nevertheless, the NCBA standard 2005 "Offer to Purchase and Contract" form, which the Johnsons and Schultzes utilized, obligates the seller to deliver fee simple, marketable, and insurable title to the buyer via general warranty deed at closing. It obligates the buyer to provide the "Balance of the purchase price in cash at Closing." However, in spite of the "cash" requirement, the attorney handling the closing typically deposits all funds paid by the buyer and the lender into his trust account and makes payments to the seller and others from the trust account, which is exactly what occurred here. *Id.* at 524. "Closing" is "defined as the date and time of recording of the deed."

"*The most common practice in North Carolina is*" for the buyer's attorney to handle the closing, including the preparation of the closing statement(s) and the disbursement of the funds. *Id.* at 509. In this regard, generally,

> [t]he closing attorney will collect from the buyer a certified check (or comparable check guaranteeing payment) for the amount due from the buyer. The buyer's lender will have provided the closing attorney with a certified check for the amount of the buyer's loan (if any) or may have wired the funds to the attorney's trust account. *There will be no disbursement of funds at the closing meeting.* The closing attorney will place all funds in his trust or escrow account and will not disburse any of the funds until he can perform a final title search.

*Id.* Finally, in "real estate transactions involving a one- to four-family residential dwelling or a lot restricted to residential use[,]" such as the transaction here, before disbursing the remaining sales proceeds owed to the seller, the "settlement agent," who is often the closing attorney, must verify that the funds the buyer and lender deposited into his trust or escrow account are sufficiently reliable and must

make sure that the executed deed to the property, and if applicable, the deed of trust are recorded. N.C. Gen. Stat. §§ 45A-2, -4 (2007).

### C. Entitlement Theory

Here, the trial court resolved this case based on the entitlement rule. The " 'entitlement rule' " has been "adopted in all jurisdictions that have considered" how "to allocate losses of money deposited in escrow." Robert L. Flores, *A Comparison of the Rules and Rationales for Allocating Risks Arising in Realty Sales Using Executory Sale Contracts and Escrows*, 59 Mo. L. Rev. 307, 309 (1994) (hereinafter, "Flores, *Escrows*") (footnotes omitted). The entitlement rule generally places the risk of loss as to escrow monies on the depositor-buyer under the theory that the escrow holder is the buyer's agent "even if the escrow holder was the seller's . . . attorney[.]" *Id.* (footnote omitted). However, "fault overrides" the general rule of allocating the risk of loss to buyers. *Id.* at 327 (footnote omitted).

> For escrow loss, the cases in which fault has been given a determinative role . . . may be viewed in three categories. First, there are cases in which one party has caused a delay in closing of escrow, thus extending the risk period. Second, there are cases in which one party has committed some act, other than mere delay, that enabled the holder to lose or embezzle the money. Third, there are cases in which one party has had a closer relationship with the wrongdoing holder, and might be blamed for putting the holder in a position to cause the loss.

*Id.* at 331-32.

In the absence of fault, the entitlement rule shifts the risk of loss solely to the party holding "title" to the funds at the time the misappropriation occurred, a determination based on whether the escrow conditions have been fully performed at the time of embezzlement. *Id.* at 344-45, 352. If all escrow conditions have not been performed, the risk of loss remains solely with the buyer. *Id.* at 352. If all conditions have been performed, the risk of loss shifts solely to the seller. *Id.* In other words, the risk falls squarely on either the buyer or seller.

The trial court's judgment indicates that the court believed an escrow arrangement was utilized here. In addition, the trial court appeared to shift the risk of loss to the Johnsons as sellers not based on fault but because the Johnsons were "entitled to receive th[e] sales proceeds at the time of . . . embezzlement." In other words, in

accordance with the entitlement rule applicable to "innocent" parties, the court appeared to conclude that the Johnsons had title to the money because all of the conditions of the parties' escrow agreement had been performed at the time of Mr. Parker's defalcation.

Both the Johnsons and the North Carolina State Bar ("the State Bar") argue that the transaction here is not an escrow. Consequently, they contend the entitlement rule does not apply and that the Schultzes as principals should bear the risk of loss due to the defalcation of their attorney or agent Mr. Parker. The Johnsons further argue that even if the arrangement here is an escrow, this Court's decision in *GE Capital Mortgage Services v. Avent*, 114 N.C. App. 430, 442 S.E.2d 98 (1994), which is the only North Carolina appellate case to apply the entitlement theory, establishes that in the absence of fault, the risk of loss is then allocated based on the attorney-client relationship. The Johnsons assert this conclusion is strongly supported by the following equitable principle emphasized by this Court in *Avent*:

> Our holding is consistent with the equitable principle that " 'where one of two persons must suffer loss by the fraud or misconduct of a third person, he who first reposes the confidence or by his negligent conduct made it possible for the loss to occur, must bear the loss.' "

*Id.* at 435, 442 S.E.2d at 101 (quoting *Zimmerman v. Hogg & Allen*, 286 N.C. 24, 30, 209 S.E.2d 795, 799 (1974)).

The Schultzes and the North Carolina Land Title Association ("NCLTA") argue that the arrangement here is an escrow, that *Avent* and the entitlement rule do apply, and that their application compels the grant of summary judgment in the Schultzes' favor.

As discussed *infra*, we essentially agree with the Johnsons that the arrangement here does not constitute an "escrow," and consequently, in accordance with equity, the risk of loss here should fall on those parties who had an attorney-client relationship with Mr. Parker.

> Binding clients to the acts of their lawyers can be unfair in some circumstances[, such as where a] client might have authorized a lawyer's conduct only in general terms, without contemplating the particular acts that lead to liability. However, it has been regarded as more appropriate for costs flowing from a lawyer's misconduct generally to be borne by the client rather

than by an innocent third person. Where the lawyer rather than the client is directly to blame, the client may be able to recover any losses by suing the lawyer, a right not generally accorded to nonclients[.]

Restatement (Third) of The Law Governing Lawyers § 26, cmt. b (2000). However, even assuming, *arguendo*, that the arrangement between the Johnsons and the Schultzes is an "escrow," we agree with the Johnsons that *Avent* establishes that where there is no fault and the buyer and seller are essentially "innocent" parties, the risk of loss should be allocated based on the attorney-client relationship.

## D. Escrow

At the outset, we note that our research has failed to yield a single North Carolina case which defines an escrow. A leading encyclopedia on escrow provides:

An "escrow," as a general rule, is created when the grantor parts with all dominion and control of a instrument or money by delivering it to a third person or a depository with instructions to deliver it to the named grantee upon the happening of certain conditions. It is an instrument which by its terms imports a legal obligation, and which is deposited by the grantor, promisor or obligor, or his agent with a stranger or a third party, the depositary, to be kept by him or her until the performance of the condition or the happening of [a] certain event and then to be delivered over to the grantee, promisee, or obligee. "Escrow" by definition means "neutral," independent from the parties to the transaction . . . . Thus, when, pursuant to an agreement, money is left in [the] hands of the attorney or agent of one of the parties, an escrow is not created; however, in some jurisdictions, one may be the escrow agent of both parties to an escrow if there is nothing inconsistent or antagonistic between his acts for the one and the other.

28 Am. Jur. 2d *Escrow* § 1 (2000) (footnotes omitted). Furthermore, "there are two somewhat different types of escrow arrangements frequently associated with realty sales[,]" the " 'deed and money' escrow" and the " 'set-aside' escrow, or 'cure' or 'repair' escrow." Flores, *Escrows*, 59 Mo. L. Rev. at 320-22 (footnotes omitted).

[A] "set-aside" escrow . . . typically [is] used to salvage the closing of a sale which otherwise would be canceled due to the discovery of a minor physical defect of the realty, or the failure . . .

to have cleared all liens or other encumbrances on the title to the realty. The sale goes forward and the deed is delivered to the buyer and [typically] the bulk of the purchase price is delivered to the seller. A portion of the price is placed in escrow, to be released to the seller after the seller, for example, . . . clears the title by paying the overdue tax assessment or mortgage lien.

*Id.* at 322 (footnote omitted). In other words, in a "set-aside" escrow, but for one of the parties' failure to perform, there is no need for an escrow, and as such, it entails a degree of fault.

In contrast, in a typical "deed and money" escrow;

[s]oon after entering into a contract for the sale of the realty, or perhaps simultaneously, the buyer and seller agree upon a person to serve as escrow holder. The parties agree that the buyer will deposit with the escrow holder some portion of the purchase price, and the seller will deposit an executed deed and related documents. Jointly or separately the parties set forth instructions for the escrow holder. Ordinarily the buyer instructs the holder to release the purchase price to the seller when a valid deed has been recorded and a title insurance policy has been issued, after a title search has shown that the seller has marketable title. The seller instructs the holder to record and deliver the deed to the buyer when the purchase price has been deposited.

*Id.* at 321 (footnotes omitted). In other words, in contrast to a "set-aside" escrow, the creation of a "deed and money" escrow does not arise out of a failure to perform and does not involve fault. Nevertheless, both types of escrows create risks that the "deeds or . . . documents deposited by a seller will be misappropriated by the escrow holder, . . . [or] that the [escrow] holder will lose, mismanage, or simply embezzle the money on deposit[.]" *Id.* at 322-23 (footnotes omitted).

In the instant case, the record is completely devoid of any evidence tending to establish the creation of an escrow between the parties, including any escrow instructions to Mr. Parker from the buyers (the Schultzes), the sellers (the Johnsons), or the lender (State Farm Bank). Furthermore, here, the only "conditions" that appear in the record are those provided in the parties' "Offer to Purchase and Contract[.]" In contrast, in *Avent*, the Court explicitly mentioned that there was an "escrow agreement," requiring the "escrow agent," who was the buyer's closing attorney, to deliver the remaining sales pro-

ceeds to the seller once the seller cancelled the prior lender's deed of trust. *Avent*, 114 N.C. App. at 431-32, 442 S.E.2d at 99. Hence, based on the above definitions and law, the arrangement in the instant case does not appear to be a formal escrow.

Nevertheless, regardless of whether the arrangement here is classified as an escrow, we are aware that the same "escrow" risk of attorney defalcation is present. However, even assuming, *arguendo*, that the arrangement here is an escrow, we believe that in the context of North Carolina residential real estate transactions, this Court's decision in *Avent* establishes that courts should first allocate the risk of loss based on fault, and in the absence of fault, allocate it based on the attorney-client relationship. Furthermore, we believe that as between essentially "innocent" parties, the imposition of the risk of loss on the parties who were actually represented by the wrongdoing attorney is not only more consistent with how residential real estate transactions are generally closed in this state, but also produces a more equitable result.

### E. *Avent's* "Entitlement" Rule

Assuming, *arguendo*, the arrangement here is an escrow or sufficiently equivalent to an escrow so as to trigger the application of entitlement rule analysis, we believe this Court's "entitlement" analysis in *Avent* establishes that in the absence of entitlement based on fault, the risk of loss should be allocated based on the attorney-client or agency relationship in accordance with equity. In this regard, we believe it is significant that in *Avent*: (1) the "escrow" at issue was a "set-aside" escrow which was only created due to the seller's failure to perform at closing, as opposed to the instant case, which would be classified as a "deed and money" escrow; (2) the Court explicitly noted that the parties in that case agreed that entitlement theory applied; and (3) the Court explicitly squared its holding with the equitable principle cited *supra*.

*Avent* is the only North Carolina appellate decision to utilize the entitlement rule, and it shares numerous factual similarities with the instant case: (1) it was a residential real estate transaction; (2) the buyers had obtained financing from a lender; (3) there appeared to be only one closing attorney, who was chosen by the buyers; (4) the attorney embezzled the sales proceeds still owed to the seller from his trust account; and (5) the seller executed the deed to the buyers at closing. *Avent*, 114 N.C. App. at 431-32, 434, 442 S.E.2d at 99, 101. However, it is very significant that, unlike here, where both the

Schultzes and the Johnsons were prepared to meet their contractual obligations at closing, the seller in *Avent* was not. *Id.* at 431-32, 442 S.E.2d at 99. In other words, in *Avent*, but for the seller's failure to perform, the escrow never would have been created.[3]

The dissent argues the Court's analysis in *Avent* merely involves a straightforward application of the general entitlement rule and that the decision clearly establishes that the risk of loss should be allocated based on who held title to the funds at the time of defalcation. We disagree. First, we think it is debatable as to how completely the Court in *Avent* embraced the general entitlement theory. In this regard, we think it is significant that before beginning its analysis, the Court in *Avent* specifically noted, "the parties agree that generally when property in the custody of an escrow holder is lost or embezzled by the holder, as between the buyer and the seller, the loss falls on the party who was entitled to the property at the time of the loss or embezzlement." *Avent*, 114 N.C. App. at 432, 442 S.E.2d at 100. In other words, the parties agreed to resolve the issue based on the entitlement rule, and the Court analyzed it as such.

Next, in spite of the fact that: (1) the buyer had chosen Avent as the attorney; (2) the lender had consented to the arrangement; and (3) the escrow conditions had not been performed at the time of embezzlement, factors which, under the general entitlement rule, would result in placing the risk of loss solely on the buyer, the Court concluded that the risk of loss fell on the seller because the funds were in escrow solely due to the seller's failure to perform at closing. *Id.* at 434-35, 442 S.E.2d at 101. Hence, while the Court held that the seller "was entitled to the funds held in escrow at the time of the embezzlement and that [the seller] . . . therefore [had to] bear the loss[,]" we believe the Court based this conclusion on the seller's fault (failure to perform) because but for the seller's fault, the escrow would never have been created. *Id.* at 435, 442 S.E.2d at 101. In fact, the Court explicitly stated:

> While it is true that Avent was retained by the [buyers], and consented to by [the lender], it was [the seller] who gave him the opportunity to abscond with the escrow funds by failing to meet

3. As a result, the buyer and seller agreed that Avent, (who had served as the buyer's closing attorney), would hold the net proceeds of the sale ($136,723.74) in his trust account until the seller could produce the cancelled deed of trust. Approximately six weeks later, the seller notified Avent that the deed of trust had been cancelled and requested that Avent deliver the escrow funds in accordance with the agreement; however, Avent did not comply as he had misappropriated the funds.

its contractual obligations, thereby necessitating the escrow agreement as a means of closing the transaction as scheduled.

*Id.* Finally, we think it is particularly significant that the Court was careful to square its analysis and holding with a long-standing principle of equity: "Our holding is consistent with the equitable principle that ' "where one of two persons must suffer loss by the fraud or misconduct of a third person, he who first reposes the confidence or by his negligent conduct made it possible for the loss to occur, must bear the loss." ' " *Id.* (quoting *Zimmerman*, 286 N.C. at 30, 209 S.E.2d at 799).

Furthermore, we believe that this Court's decision in *Avent* and the equitable principle highlighted within it establish that in the absence of fault, our courts should consider the attorney-client relationship and impose the loss on those parties whom the attorney represented. In other words, as between essentially "innocent" parties, if the attorney solely represented the buyer or the seller, then the loss should fall solely on that party alone. However, if the attorney represents both buyer and seller, the buyer and seller should share the loss. Finally, we believe this approach is much more consistent with the equitable principle highlighted in *Avent*, as well as the manner in which the majority of North Carolina residential real estate transactions are closed, than the general entitlement rule which, in the absence of fault: (1) imposes the risk of loss solely on buyers even where a seller's attorney misappropriates the funds; and (2) shifts the loss solely to sellers based on an artificial determination that the buyer's attorney becomes the seller's "agent" once the "escrow" conditions have been performed. *See* Flores, *Escrows*, 59 Mo. L. Rev. at 361.

## F. Fault

Clearly, Mr. Parker bears the ultimate responsibility for his malfeasance. In addition, while the Johnsons did not present the trust account check to a financial institution for payment until May 2006: (1) the Schultzes concede that Mr. Parker misappropriated the funds on 4 January 2006; (2) the real estate transaction was closed late in the afternoon on 3 January 2006; (3) pursuant to N.C. Gen. Stat. § 45A-4, Mr. Parker was not permitted to disburse the sales proceeds to the Johnsons until the deed and deed of trust were recorded, which occurred at 4:46 p.m.; and (4) Mr. Johnson testified that he was unable to leave Mr. Parker's office until after 5:00 p.m., at which time the banks were closed. As such, unlike with the "set-

aside" escrow in *Avent*, it cannot be said that "but for" the Johnsons' failure to cash the trust account check until May 2006, Mr. Parker could not have stolen the trust account monies because he had already misappropriated them.

While not explicitly labeled as fault, the dissent argues that the risk of loss should be shifted to the Johnsons as sellers because they "chose to accept" a check drawn on Mr. Parker's trust account instead of demanding cash as provided in the standard 2005 NCBA contract form or "some other surer method of payment." As discussed *infra*, because such a rule would significantly disrupt the way residential real estate transactions are traditionally closed in North Carolina and because such a rule would conflict with the equitable principle highlighted in *Avent*, we disagree.

At the outset, we note our disagreement with the dissent's explanation of the Johnsons' and a typical seller's decision to accept a check drawn on an attorney's trust account purely as a product of the seller's free choice. While it is true that the standard 2005 NCBA contract form provides the seller with the right to receive the balance of the purchase price in cash, as discussed *supra*, a seller who demands cash would be highly atypical. Furthermore, in residential real estate transactions such as in the case *sub judice*, the closing attorney typically does not represent the seller, and by law, the attorney is not permitted to distribute funds to the seller until the deed is recorded. As such, the typical seller would likely be unaware as to what form of payment the buyer will provide until the actual closing or possibly until the deed has already been executed and recorded.[4] Though the seller could still refuse the payment, this would almost certainly delay the completion of the closing. As such, while the dissent frames a seller's "choice" to receive an attorney's trust account check purely as a product of the seller's own convenience or as a product of def-

---

4. Here, as noted *supra*, while the funds State Farm Bank provided on behalf of the Schultzes ($200,320.24) were present in Mr. Parker's account on 3 January, the Schultzes did not provide their check for the remaining balance ($76,933.56) to Mr. Parker until 3 January and these funds were not credited to Mr. Parker's account until 4 January. In addition, while the dissent argues that the Johnsons as sellers should have required a "surer method of payment," we note that this Court has held that given the North Carolina State Bar's regulations and enforcement mechanisms that apply to attorney trust accounts: Checks written on these accounts have "an added layer of security that personal checks do not have[; b]ecause of this security, [trust account] checks . . . have more in common with certified checks than personal checks[;] and certified checks are frequently equated by state statute with cash money." *In re Will of Turner*, 184 N.C. App. 168, 176, 645 S.E.2d 849, 850-51, *disc. review denied*, 361 N.C. 568; 651 S.E.2d 565 (2007).

erence to the typical practice, we believe this ignores the fact that the seller's decision to accept a trust account check, i.e., to not delay the closing, can also be viewed as an accommodation to the buyer.[5] As such, we do not think that by accepting a check drawn from Mr. Parker's trust account, the Johnsons exhibited any fault.

Most significantly, we believe that shifting the risk of loss based merely on the form of payment the seller accepts would significantly disrupt the way residential real estate closings are handled under our current system, especially in terms of creating delay, and would shift the risk of loss to the seller in almost every case unless the seller demands payment in cash. Such a rule squarely conflicts with the equitable principle emphasized by this Court in *Avent* and does not take into account the unique way residential real estate transactions are typically closed in North Carolina, i.e., by a single attorney chosen by the buyer. Furthermore, while certainly neither a buyer nor a seller would expect an attorney to misappropriate the closing funds, as we emphasized *supra*:

> [I]t has been regarded as more appropriate for the costs flowing from a lawyer's misconduct generally to be borne by the client rather than by an innocent third person. Where the lawyer rather than the client is directly to blame, the client may be able to recover any losses by suing the lawyer, a right not generally accorded to nonclients[.]

Restatement (Third) of the Law Governing Lawyers § 26, cmt. b (2000).

Hence, given the lack of fault here, in accordance with equity and the "entitlement" rule as articulated in *Avent*, the risk of loss here should have been allocated based on which parties reposed confidence in Mr. Parker, i.e., which parties had an attorney-client relationship with him.

## G. Attorney-Client Relationship

"[T]he relation of attorney and client may be implied from the conduct of the parties, and is not dependent on the payment of a fee, nor upon the execution of a formal contract." *N. C. State Bar v. Sheffield,* 73 N.C. App. 349, 358, 326 S.E.2d 320, 325 (citation omitted), *cert. denied,* 314 N.C. 117, 332 S.E.2d 482, *cert. denied,* 474 U.S.

---

5. For example, given that the interest rate a buyer receives from a lender is typically conditioned upon the closing occurring within a particular time frame, a decision to delay the closing may result in the buyer losing its preferred interest rate.

981, 88 L. Ed. 2d 338 (1985). Here, in allocating the risk of loss between two essentially "innocent" parties, the trial court erred by not allocating the risk to those parties who had an attorney-client relationship with Mr. Parker. We note that the Schultzes admitted below and continue to admit that Mr. Parker was their attorney. Consequently, we conclude that the trial court erred by granting summary judgment in the Schultzes' favor, and because Mr. Parker acted as their attorney, we further conclude the Schultzes must bear the loss.

In contrast to the Schultzes, the Johnsons asserted below that they did not have an attorney-client relationship with Mr. Parker. However, the Schultzes disputed this assertion, contending that in addition to representing them, Mr. Parker also served as the Johnson' attorney or agent at closing. Because the trial court failed to consider this disputed issue of material fact between the parties, we remand this case to the trial court with instructions to consider whether Mr. Parker also acted as the Johnsons' attorney, and consequently, whether the Johnsons' must share the loss.

### H. Title Insurance and Closing Protection Letter

Here, neither the Johnsons nor the Schultzes argue that they intended to shift the risk of loss in this transaction based on title insurance or the closing protection letter. In addition, they do not argue that the Schultzes' title insurance policy or the closing protection letter cover this loss. As such, these issues are not properly before this Court.

### I. Enhanced Consumer Protection

While chapter 45A of the North Carolina General Statutes seeks to protect buyers, lenders, and sellers from each other's unscrupulous actions, neither it, nor any other statutory law protects these parties from the crippling economic loss that an attorney's malfeasance can potentially impose on them if the attorney absconds and is essentially judgment proof. N.C. Gen. Stat. §§ 45A-1-45A-7 (2007). Our law imposes no bonding or malpractice insurance requirements on attorneys in general, let alone in the context of residential real estate closings where an attorney might handle hundreds of thousands of dollars in trust monies. Either requirement would shift some of the economic risk via insurance from typically innocent and unsophisticated buyers and sellers to the wrongdoing attorney. While the Client Security Fund provides a possible source of some relief, it is clearly

a fund of last resort. *See* 27 NCAC 1D, Rule .1401(b)(7),(8). In addition, whether a loss is reimbursable is in the sole discretion of the board who administers the Fund, and even if the loss is deemed reimbursable, reimbursement is capped at $100,000.00. *Id.* Rules .1417(b), .1418(g). As such, our legislature may wish to consider creating safeguards to protect "innocent" consumers in residential real estate sales such as those that exist in Virginia.[6]

### III. Conclusion

In sum, we conclude that where, as here: (1) one attorney is used to handle a residential real estate closing, (2) the attorney misappropriates the remaining balance of the purchase price owed to the seller, and (3) the risk of loss must be allocated to one or more parties, courts should first consider the existence of fault. However, if fault does not exist and the risk must be allocated between essentially "innocent" parties, courts should then consider which parties had an attorney-client relationship with the wrongdoing attorney and impose the risk of loss on those parties. Where multiple parties to the transaction have an attorney-client relationship with the offending attorney, the risk of loss should be shared among them.

Because the trial court resolved this case under a misapprehension of law, we reverse the grant of summary judgment in the Schultzes' favor. Furthermore, because the Schultzes admit that Mr. Parker was their attorney, we conclude that the Schultzes' must bear the loss. Finally, because the trial court did not consider whether Mr. Parker also acted as the Johnsons' attorney, a material issue of fact which the Johnsons and the Schultzes disputed below, we remand and instruct the trial court to consider this issue to determine if the Johnsons must share the loss.

Reversed and remanded.

Chief Judge MARTIN concurs.

Judge WYNN dissents in a separate opinion.

---

6. For example, Virginia law requires, *inter alia*: (1) an "errors and omissions or malpractice insurance policy providing a minimum of $ 250,000 in coverage"; (2) "[a] blanket fidelity bond or employee dishonesty insurance policy covering persons employed by the settlement agent providing a minimum of $ 100,000 in coverage"; and (3) "[a] surety bond of not less than $ 200,000[]" for "transactions involving . . . not more than four residential dwelling units." Va. Code Ann. §§ 6.1-2.21(D), 6.1-2.19(C) (2007).

WYNN, Judge, dissenting.

This matter arises from the misappropriation of real estate sales proceeds by the closing attorney after the closing of the real estate transaction. The issue on appeal is whether the residential buyers should be held accountable for the residential sellers' decision to accept their sales proceeds in the form of a check rather than in cash, as provided for in the sales contract, or some other surer method of payment. Because the sellers chose to accept a check rather than cash, I hold that the buyers are not accountable for the actions of the closing attorney that later rendered that check worthless. Additionally, my holding is supported on the grounds that, after the closing, the buyers had neither a claim to the trust account funds, nor control over how the sellers chose to accept payment of those funds.[7]

In *GE Capital Mortgage Services v. Avent,* 114 N.C. App. 430, 432, 442 S.E.2d 98, 100 (1994), this Court held: "[G]enerally when property in the custody of an escrow holder is lost or embezzled by the holder, as between the buyer and the seller, the loss falls on the party who was entitled to the property at the time of the loss or embezzlement." Further, this Court explained:

> Ordinarily, the determination as to which party is entitled to the escrow property depends upon whether the conditions of the escrow were satisfied prior to the loss or embezzlement. For example, if the escrow agent embezzles the purchase price prior to the seller's performance of the escrow condition, the buyer has retained title to the money and must therefore bear the loss. Conversely, if the embezzlement occurs after the seller has performed the escrow condition, then the seller must bear the loss because he was entitled to it at the time of the embezzlement.

*Id.* at 432-33, 442 S.E.2d at 100 (internal citations omitted).

---

7. The majority emphasizes "common practices" in the "typical" residential real estate closing in North Carolina to defeat the contractual requirement to provide the "balance of the purchase price in cash at Closing." Surely, this issue would not be before us if the sellers had insisted that the contract requirements be carried out, thus the wisdom of the language in the contract between the seller and the buyer. The "common practice" of accepting an attorney's trust account check is a practice undertaken by the seller, not the buyer. Indeed, the consideration at closing given to the buyer follows the contractual requirement of delivering a "fee simple, marketable, and insurable title to the buyer via general warrantee deed." This case illustrates that when a seller chooses, as a matter of common practice, to substitute the contractual requirement of cash for the convenience of an attorney's trust account check, then the allocation of the risk falls upon the seller, not the buyer.

**JOHNSON v. SCHULTZ**

[195 N.C. App. 161 (2009)]

The majority interprets the decision in *Avent*, the only North Carolina case to apply the entitlement theory, to stand for the proposition that, in the absence of fault, the courts should impose the loss on the party represented by the wrongdoing attorney. However, I do not agree that the existence of an attorney-client relationship determines the outcome of this case because the conduct of the attorney in this case exceeded the scope of any agency relationship created with either the buyers or the sellers. The attorney was tasked with performing legal services for the closing of the real estate transaction. Indeed, the attorney's conduct, of criminally misappropriating the real estate sales proceeds from his trust account after the closing, was outside the scope of the attorney-client relationship created to close this transaction. Neither the buyers nor the sellers should be held accountable for the intentional and criminal conduct of the attorney which went beyond the scope of an attorney-client relationship.

I also see no need to remand this matter to the trial court to consider whether the closing attorney acted as the sellers' attorney. As the majority notes, this real estate closing was conducted via the settlement closing method and all of the conditions for closing this real estate matter were satisfied, including the making of payments to the seller and others from the trust account, which according to the majority, "is exactly what occurred here."

Rather than holding the buyers liable for the criminal actions of the attorney, which were well beyond the scope of the attorney-client relationship, we should follow the teachings of *Avent*. Thus, in this case, as was done in *Avent*, we should ultimately allocate the risk of loss to the party that held title to the funds in escrow at the time of the embezzlement. We should also follow the conclusion of *Avent* and hold that "[h]aving obtained title to the property [at closing], the [buyers] no longer held title to the funds in escrow. Thus . . . [the sellers] must bear the loss resulting from [the attorney's] embezzlement of the escrow funds." *Avent*, 114 N.C. App. at 434-35, 442 S.E.2d at 101.

The logic of this outcome is confirmed by the conduct of the sellers in the exercise of their choice to receive the sales proceeds in the form of a check which allowed the recalcitrant attorney to misappropriate the funds after the closing date.[8] Here, at the time of the clos-

---

8. Analyzing this case under contract law rather than the "common practices" in "typical" real estate closings does not, as the majority states, "disrupt the way residential real estate transactions are traditionally closed in North Carolina." Indeed, any

ing, the sales proceeds for the real estate transaction were in the trust account of the closing attorney. In exchange for conveying title to the buyers, the sellers chose to accept those proceeds in the form of a check, drawn upon the attorney's trust account. Once the buyers obtained title to the property, they no longer had any claim to the funds in the closing attorney's trust account, nor did they have control over how the seller would choose to accept those funds. The monies in the trust account at that time belonged to the sellers who, under the sales contract, could have required payment in the form of cash. Instead, the sellers chose to accept a check and now desire to place the risk of doing so on the buyers. In my view, the relationship between the buyers and sellers consummated when, in exchange for conveying title to the buyers, the sellers accepted the trust account sales proceeds in the form of a check rather than cash, as provided for in the sales contract.

Indeed, notwithstanding the sales contract requirement that the sales proceeds be paid in cash, the sellers were free to accept any other means of payment—perhaps for their own convenience or out of deference to the "typical" practice of accepting a trust account check. In any event, that was a decision made by the sellers, not the buyers. It is undisputed that the sales proceeds were in the trust account on the date of closing and could have been converted to cash, issued as a certified check or money order, wired to the sellers' account, or transferred by some other commercial transaction method that would have been surer than a check. Common sense dictates that the risks of accepting a check are far greater than those associated with accepting cash or some other surer method of payment.[9]

It follows that the buyers should not be held accountable for the sellers' decision to accept their payment in the form of a check rather than cash or some other surer method of payment. Ultimately, the risk of accepting sales proceeds from a real estate transaction in pay-

disruption in that tradition arises from the malfeasance of the attorney in this matter, which exposed the risk of accepting an attorney's trust account check—i.e., the attorney could steal the money from the account. When the law explicitly answers an issue, we need not rely upon equitable principles to prop up common practices that create risks.

9. The majority relies upon *In re Will of Turner* to analogize an attorney's trust account check to a certified check. The differences between the two types of checks are far greater than the similarities—e.g., a certified check is based on the integrity of a bank or financial institution whereas an attorney's trust account check is based on the integrity of the attorney. This case illustrates the greater risk of accepting an attorney's trust account check rather than a check certified by a financial institution.

ment forms other than cash, as provided for by the sales contract, is on the sellers, not the buyers.[10]

———

10. The majority points out that following the law under the residential contract "would almost certainly delay the completion of the closing" and that such a delay "may result in the buyer losing its preferred interest rate." However, this case illustrates how the substitution of "common practices" for the letter of the law arising under the residential contract can delay the closing for years. The closing in this matter occurred on 3 January 2006 and remains unsettled as a result of the seller's choice to accept an attorney's trust account check rather than a surer method of payment, as provided for under the residential sales contract.