CHARLES S. NORBURN AND WIFE, HELEN J. NORBURN v. PAUL E. MACKIE, RUTH M. MACKIE, AND HORACE J. ISENHOWER, SR.

(Filed 20 May, 1964.)

**1. Pleadings § 29;    Evidence § 20—**

An admission in a pleading is a judicial admission establishing the facts admitted for the purpose of the case and obviating the necessity of proof by the adverse party.

**2. Husband and Wife § 3—**

A husband is not the agent of his wife solely by reason of the relationship, and no presumption of agency arises therefrom.

**3. Same—**

Agency of a husband to act for his wife in a particular transaction may be established by direct or circumstantial evidence, and only slight evidence of agency is necessary when the wife receives and retains the benefits of the contract negotiated by him.

**4. Same—**

Admissions in the joint answer of the husband and wife that they owned the lands in question, that the husband verbally authorized a broker to sell the lands, that the purchase money was paid to the husband alone but

that "defendants" paid the broker's commission for the sale, permits the inference that the wife received or obtained the benefit of a part of the purchase price and is sufficient to be submitted to the jury on the question of the husband's agency.

**5. Principal and Agent § 5;    Brokers and Factors § 3—**

Declarations by a broker as to the quantity and condition of the land, made in negotiations with a prospective purchaser, are within the scope of his employment and are competent in evidence against his principals.

**6. Appeal and Error § 51—**

On appeal from compulsory nonsuit, evidence erroneously excluded in the lower court is to be considered.

**7. Principal and Agent § 9—**

As a general rule, the principal is responsible to third parties for injuries resulting from the fraud of his agent committed during the existence of the agency and within the scope of the agent's actual or apparent authority, even though the principal did not know of or authorize the commission of the fraudulent acts.

**8. Principal and Agent § 11—**

A person is personally liable for a fraud committed by him notwithstanding that he was acting as agent for another.

**9. Brokers and Factors § 5;    Fraud § 11—**

Evidence that the broker, in negotiating with a prospective purchaser, knew that the purchaser, because of his physical condition, was unable to inspect the land personally, that the broker represented that he knew the land well and made a positive and grossly erroneous statement as to the number of acres of pasture in the tract, and that the purchaser in reliance on the representation paid a purchase price computed on the number of acres of pasture land in the entire tract, *is held* sufficient to be submitted to the jury in an action for fraud.

**10. Principal and Agent § 8—**

As a general rule, a principal is chargeable with and bound by the knowledge of or notice to his agent while the agent is acting within the scope of his authority and in reference to matters over which his authority extends, although the agent does not in fact inform his principal thereof.

**11. Appeal and Error § 51—**

Where a new trial is awarded, the Supreme Court will refrain from discussing the evidence except to the extent necessary to pass upon the exceptions.

HIGGINS, J., took no part in the consideration or decision of this case.

APPEAL by plaintiffs from *Martin, S. J.*, September 1963 Civil Session of BUNCOMBE.

Civil action to recover actual and punitive damages for false and fraudulent representations made by the defendants in connection with the sale of land owned by the Mackie defendants to plaintiffs.

From a judgment of compulsory nonsuit of plaintiffs' action, entered at the close of plaintiffs' evidence, they appeal.

*Williams, Williams & Morris by Robert R. Williams, Jr., for plaintiff appellants..*

*Williams and Pannell for Paul E. Mackie and Ruth M. Mackie, defendant appellees.*

*Sigmon and Sigmon by Jesse Sigmon, Jr., for Horace J. Isenhower, Sr., defendant appellee.*

PARKER, J. Plaintiffs' evidence, considered in the light most favorable to them, *Scott v. Darden*, 259 N.C. 167, 130 S.E. 2d 42, shows the following facts:

For several years prior to 14 September 1961, defendants Paul E. Mackie and wife, Ruth M. Mackie, owned a large tract of land in Ashe County, which is described by metes and bounds in the complaint. Sometime prior to 14 September 1961 Paul E. Mackie verbally authorized and empowered his co-defendant, Horace J. Isenhower, Sr., to aid him in finding a buyer for this land he and his wife owned at the price of $65 an acre; this is admitted in the joint answer of the Mackie defendants and in the separate answer of defendant Isenhower, which admissions were introduced in evidence by plaintiffs.

In July or August 1961 Isenhower ran the following advertisement in the Charlotte Observer, a newspaper published in Charlotte, North Carolina, in respect to the Mackie defendants' land: "696 ACRES, near West Jefferson, Mountain grazing land, 500 acres excellent improved pasture, best of fence. Plenty water. Write Box X-12 Observer."

At this time there lived in Buncombe County Dr. Charles S. Norburn, an elderly, retired doctor of medicine, who owned and operated two small dairy farms. His two farms were too small to be profitable. and he had decided to sell them and to buy a large tract of land, where land was cheaper, to raise beef cattle. Upon reading the above advertisement in the Charlotte Observer, he wrote to "Box X-12 Observer," Charlotte, asking for a description of the land and its price.

Dr. Norburn received a letter from defendant Isenhower, dated 9 August 1961, which is in part as follows:

"The 696 acre farm that I advertised in the Charlotte Observer is located on top of Pond Mountain and contains 500 acres of ex-

cellent, improved pasture and is fenced with the best of fencing as well as gates, loading platforms, truck scales and scale sheds for weighing cattle.

\*      \*      \*

"\* \* \* The remaining 196 acres are in timber on the border of the farm and are lower than the pasture which covers the top of the mountain. The grass is waist high now since there have been no cattle on it this season. The pasture has been kept up by the recommendation of the North Carolina Agriculture Department. Therefore, tons of fertilizer have been applied each year.

"Fescue, blue grass, and clover make up the pasture \* \* \*.

"We will sell this land for $65.00 per acre. The county tax is $120.00 per year, terms can be arranged.

"Since I just completed 7½ years as State Director of the Farmers Home Administration of North Carolina, I know farms in all sections of this State; and this farm has good possibilities for the investment."

Upon objection of the Mackie defendants, the court excluded the letter as to them, and plaintiffs excepted and assign this as error.

Isenhower's letter to Dr. Norburn described the location of the land and the way to go to it. Several days after receiving this letter, Dr. Norburn had J. M. Crawford, who worked for him on one of his farms, to drive him to the Mackie land. Upon reaching it, they drove into the pasture, and ahead of them was a steep bluff about 200 feet high. A steep, washed road ran up this bluff, which they could not drive up with their car. They walked up this bluff. They came to the top of a narrow ridge, where there was some very fine pasture land, just as it had been described. They walked along this ridge a short distance. Several years before, Dr. Norburn had been seriously injured, his neck was in a cast, and this was the first trip he had made after being in bed about three and one-half years. Dr. Norburn began to have pain in his neck and had to lie down on the grass. Crawford walked on beyond a little knoll that blocked the way. He saw grass ahead for some distance. He then turned and went to the left and on around until he came to the edge of the woods, and then went back to Dr. Norburn. He was gone 15 or 20 minutes. He told Dr. Norburn: "Well, I don't know where the fence is but it is bound to be 500 acres of grass I could see up on the ridge \* \* \*. It is awful good grass what I have seen of it." They went back to the car and left.

Ten days or two weeks after this trip Dr. Norburn drove to the town of Conover and saw Isenhower about the purchase of this land.

Their conversation was in substance: Isenhower said he had been on this land a number of times; he knew it well. He repeated what he had said in his letter about 500 acres in grassland; he said he had been a State representative and knew. Dr. Norburn told him he had been very ill and would have to rely entirely on what he said, and that he could not go to the land again soon. Isenhower told him he could rely on everything he said, that it was the truth. Being of the opinion that 500 acres of pasture land was worth $65 an acre and the 196 acres of woodland worth $10 an acre, he offered $35,000 cash for the land. Isenhower telephoned the Mackies, and they said the offer was not acceptable. The day he returned home, Isenhower telephoned him his offer of $35,000 had been accepted. Upon objection of the Mackies, the conversation was excluded as to them, and plaintiffs excepted and assign this as error.

On 15 September 1961 Dr. Norburn and all the defendants met in the office of Mr. Austin, a lawyer, in the town of Jefferson to consummate the purchase and sale of this land. There Isenhower and Paul E. Mackie told him the land had in its boundaries 500 acres of improved pasture land. Paul E. Mackie took a pencil and drew on a map or plat of the land "two curved lines, one the northeastern section of the plat and one down at the southeastern section and he said that the woods lay between the boundary and these two lines and that that was all the woods there was on the boundary, and that all the rest was in improved pasture." Mr. Austin went to the courthouse, returned, and said the title was all right. Whereupon, Dr. Norburn delivered to Paul E. Mackie his cheque payable to him in the sum of $35,000 in payment of this land, which cheque has been paid. Then the Mackie defendants executed and delivered to him a warranty deed conveying this land in fee to Dr. Norburn and his wife. This deed recites the land contains 696 acres.

The Mackie defendants in their joint answer admit that they paid Isenhower the sum of $1,500 for his services and expenses; and Isenhower admits in his answer that Paul E. Mackie paid him the sum of $1,500 for his services and expenses. These admissions were introduced in evidence by plaintiffs.

A few days later Dr. Norburn obtained a TVA contour map of the section and the land he bought, showing open land in white and woodland in green. Looking at this map he saw at a glance that this land had far less cleared land than had been represented to him. Dr. Norburn then employed civil engineers and surveyors to ascertain the amount of improved pasture land and woodland on this land. Lawrence B. Tyson, who is a civil engineer and surveyor and was employ-

ed by Dr. Norburn, went on the land and computed the total acres to be 666 acres, of which 108 acres is improved pasture land, 68 acres unimproved pasture land, and 490 acres of woodland. Melvin Carter, who is a civil engineer and land surveyor in Asheville and was employed by Dr. Norburn, went on this land. He surveyed the grassland and found it consisted of 147 acres. He made the pasture land as big as he could, stretching the cleared area as far into the woods as he could.

Bryan Kirby, who is 66 years old, lives in Ashe County. His business is farming and cattle raising, and he has had considerable experience as a real estate appraiser in Ashe County. At Dr. Norburn's request he went on this land purchased by him from the Mackies to make an appraisal of its fair market value. He is familiar with the land. In his opinion, from an examination of the land, the fair market value of this land in September 1961 was $14,000. He based his opinion on these factors: He found 100 acres which seemed to have had some lime or fertilizer on it, which he valued at $75 an acre for pasture purposes. He found 40 to 50 acres of pasture land that had grown up with wild strawberries and bushes, which he valued at about $30 an acre. He considered the rest of the land worth $10 an acre.

The Mackie defendants in their joint answer admit "that sometime prior to September 14, 1961 the defendant, Paul E. Mackie, through a verbal conversation, authorized and empowered his co-defendant, Horace J. Isenhower, Sr., to assist him in finding a buyer for and in selling the lands described in paragraph 3 of the plaintiffs' complaint." Plaintiffs alleged in paragraph 6 of their complaint: "That in the month of July or August 1961, the defendant, Horace J. Isenhower, Sr., ran, or caused to be run, an advertisement in the Charlotte Observer, a newspaper published in Charlotte, North Carolina, advertising the sale of the aforesaid property, said advertisement being as follows: '696 ACRES, near West Jefferson, Mountain grazing land. 500 acres excellent improved pasture, best of fence. Plenty of water. Write Box X-12 Observer'." The Mackie defendants in their joint answer in paragraph 6 state: "That the allegations contained in paragraph 6 of the plaintiffs' complaint are admitted upon information and belief." Plaintiffs alleged in paragraph 7 of their complaint: "That said advertisement was run in said paper in furtherance of the aforesaid agency or brokerage and for the purpose of marketing the aforesaid property." The Mackie defendants in their joint answer in paragraph 7 state: "It is admitted that the said advertisement was run in said paper for the purpose of marketing the aforesaid property." Plaintiffs alleged in paragraph 13 of their complaint on information and be-

lief "that as a result of said sale the defendant, Horace J. Isenhower, Sr., received from the defendants, Paul E. Mackie and Ruth M. Mackie, compensation or commission for promising *(sic)* and negotiating said sale in an amount of at least $1,500.00." The Mackies in their joint answer in paragraph 13 state: "It is admitted that these defendants paid the defendant, Horace J. Isenhower, Sr., the sum of $1500.00 for his services and expenses." The Mackie defendants in their joint answer admit that they owned the land sold by them to plaintiffs for a cash price of $35,000.

Indubitably, the joint answer of the Mackie defendants contains judicial admissions that Horace J. Isenhower, Sr., was acting as agent for Paul E. Mackie in the sale of the land owned by him and his wife to plaintiffs, and such judicial admissions conclusively established such fact for the purposes of this case. Stansbury's North Carolina Evidence, 2d Ed., § 177.

A question, not without difficulty, is presented as to whether the judicial admissions in the joint answer of the Mackie defendants and plaintiffs' evidence show and would permit a jury to find that Paul E. Mackie was also acting as agent for his wife, Ruth M. Mackie, when he verbally "authorized and empowered his co-defendant, Horace J. Isenhower, Sr., to assist him in finding a buyer for and in selling the lands" owned by him and his wife, and to further find that Isenhower was acting in the transaction as agent of both Paul E. Mackie and Ruth M. Mackie. In our opinion, the answer to the question is, Yes.

"A husband is not *jure mariti* the agent of his wife, and if such agency is relied upon it must be proven." *Pitt v. Speight,* 222 N.C. 585, 24 S.E. 2d 350. No presumption arises from the mere fact of the marital relationship that the husband is acting as agent for the wife. *Air Conditioning Co. v. Douglass,* 241 N.C. 170, 84 S.E. 2d 828.

The joint answer of the Mackie defendants admits that they owned the land they sold to plaintiffs for $35,000, and that Paul E. Mackie verbally authorized and empowered Isenhower to assist him in finding a buyer for and in selling their land. Plaintiffs' evidence shows that Dr. Norburn's cheque in the sum of $35,000 given in payment of their land was made payable to Paul E. Mackie. However, the joint answer of the Mackie defendants admits "that these defendants paid the defendant, Horace J. Isenhower, Sr., the sum of $1500.00 for his services and expenses" in finding a purchaser and negotiating a sale of their land to plaintiffs. These judicial admissions permit the fair inference that Ruth M. Mackie received and retains part of the purchase price of this land and received the benefit of Isenhower's services, for their joint answer admits that the *defendants* paid Isenhower $1,500 for his services and expenses.

"The agency of the husband for the wife may be shown by direct evidence or by evidence of such facts and circumstances as will authorize a reasonable and logical inference that he was empowered to act for her * * *. Slight evidence of the agency of the husband for the wife is sufficient to charge her where she receives, retains, and enjoys the benefit of the contract." 41 C.J.S., Husband and Wife, § 70, pp. 548-49. The last sentence in the above quotation is repeated verbatim in the dissenting opinion by *Barnhill, J.,* in *Young v. Lucas,* 212 N.C. 194, 193 S.E. 25, in which dissenting opinion *Clarkson* and *Devin, JJ.,* joined. See also *Dobias v. White,* 240 N.C. 680, 83 S.E. 2d 785; *Smith v. Kappas,* 218 N.C. 758, 12 S.E. 2d 693; *Realty Co. v. Rumbough,* 172 N.C. 741, 90 S.E. 931.

Plaintiffs' evidence shows that the letter, dated 9 August 1961, written by Isenhower to Dr. Norburn, and the declarations by Isenhower made in respect to the Mackies' land to Dr. Norburn in the town of Conover after sending Dr. Norburn his letter, were both made and done during the agency of Isenhower and within the scope of his agency or employment, and, therefore, were admissible in evidence to bind against his principals Paul E. Mackie and Ruth M. Mackie. *Hubbard v. R. R.,* 203 N.C. 675, 166 S.E. 802; *Hughes v. Enterprises,* 245 N.C. 131, 95 S.E. 2d 577; Stansbury's North Carolina Evidence, 2d Ed., § 169; 26 Am. Jur., Husband and Wife, § 228, p. 839. The trial court improperly excluded this evidence of the letter and of the declarations by Isenhower as against the Mackie defendants, and plaintiffs' assignments of error to the exclusion of both are good.

In passing on an appeal from a judgment of compulsory nonsuit, evidence erroneously excluded is to be considered with other evidence offered by plaintiff. *Powell v. Deifells, Inc.,* 251 N.C. 596, 112 S.E. 2d 56.

The general rule is that a principal is responsible to third parties for injuries resulting from the fraud of his agent committed during the existence of the agency and within the scope of the agent's actual or apparent authority from the principal, even though the principal did not know or authorize the commission of the fraudulent acts. *Thrower v. Dairy Products,* 249 N.C. 109, 105 S.E. 2d 428; *King v. Motley,* 233 N.C. 42, 62 S.E. 2d 540; *Dickerson v. Refining Co.,* 201 N.C. 90, 159 S.E. 446; 3 C.J.S., Agency, § 257; 3 Am. Jur. 2d, Agency, §§ 261 and 264.

It is thoroughly settled that a person is personally liable for a fraud committed by him, notwithstanding that he acted as agent for another. *Mills v. Mills,* 230 N.C. 286, 52 S.E. 2d 915; 23 Am. Jur., Fraud and Deceit, § 185, p. 1010.

When Dr. Norburn was negotiating in the town of Conover with Isenhower to purchase this land, Isenhower told him he had been on this land a number of times; he knew it well. He repeated what he had said in his letter about 500 acres in grassland; he said he had been a State representative and knew. Dr. Norburn told him he had been very ill and he would have to rely entirely on what he said, and that he could not go to the land again soon. Isenhower told him he could rely on everything he had said, that it was the truth. Plaintiffs' evidence plainly shows that the parties dealt at arm's length, and that Dr. Norburn, by reason of his prior serious injury and physical condition, was unable to go over the land to see how much was pasture land and how much was woodland, and that Isenhower during such negotiations was fully aware of Dr. Norburn's inability, due to his physical condition, to go over this land to see how much was pasture land and how much was woodland. This presents an entirely different factual situation from that in *Calloway v. Wyatt*, 246 N.C. 129, 97 S.E. 2d 881, relied on by defendants.

The general rule, which is subject to certain qualifications and exceptions set forth in 3 Am. Jur. 2d, Agency, §§ 275-286, and in *Furniture Co. v. Bussell*, 171 N.C. 474, 480, 88 S.E. 484, 486, and which are not relevant on this appeal, is that a principal is chargeable with, and bound by, the knowledge of or notice to his agent received while the agent is acting as such within the scope of his authority and in reference to a matter over which his authority extends, although the agent does not in fact inform his principal thereof. *Jenkins v. Renfrow*, 151 N.C. 323, 66 S.E. 212; *Furniture Co. v. Bussell, supra; Williams v. Lumber Co.*, 176 N. C. 174, 96 S.E. 950; 3 Am. Jur. 2d, Agency, § 273; 3 C.J.S., Agency, § 262.

The essential elements of actionable fraud are thoroughly established by our decisions and need not be restated. See *Keith v. Wilder*, 241 N.C. 672, 86 S.E. 2d 444; *Roberson v. Williams*, 240 N.C. 696, 83 S.E. 2d 811; *Cofield v. Griffin*, 238 N.C. 377, 78 S.E. 2d 131; *Whitehurst v. Insurance Co.*, 149 N.C. 273, 62 S.E. 1067. Since there must be a new trial, we refrain from a discussion of the evidence presently before us, as we did in *Bass v. Roberson*, 261 N.C. 125, 134 S.E. 2d 157; *Whitaker v. Wood*, 258 N.C. 524, 128 S.E. 2d 753; *Tucker v. Moorefield*, 250 N.C. 340, 108 S.E. 2d 637; *Goldston v. Tool Co.*, 245 N.C. 226, 95 S.E. 2d 455. Suffice it to say, the Court is of opinion that in considering plaintiffs' evidence in the light most favorable to them, they are entitled to have their case submitted to a jury.

Defendant Isenhower's demurrer *ore tenus* to the complaint, which is set forth in his brief, is without merit and is overruled.

The judgment of compulsory nonsuit dismissing plaintiffs' action is Reversed.

HIGGINS, J., took no part in the consideration or decision of this case.