WILLIAM WOOD JOHNSON AND WIFE, SUZANNE WAYNE JOHNSON v. TIMOTHY P. SCHULTZ AND WIFE, SHELLEY D. SCHULTZ, DONALD A. PARKER, JERRY HALBROOK, TRUSTEE, AND STATE FARM BANK, F.S.B.

No. 75A09

(Filed 15 April 2010)

**Real Estate— embezzlement by closing attorney—risk of loss—born by buyers**

The trial court erred by granting summary judgment for the buyers in an action arising from the embezzlement of escrow funds by an attorney during a real estate closing, and the Court of Appeals correctly reversed that judgment. Considering the pro-

cedures customarily used for residential real estate closings and applying long-standing principles of equity, the buyers must bear the loss caused by the misconduct of their own attorney. However, in this case, there is evidence of a prior relationship with the attorney by the sellers, and the matter was remanded for a factual inquiry into whether the attorney also represented the sellers during the closing process.

Justice TIMMONS-GOODSON dissenting.

Justice HUDSON joins in this dissenting opinion.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 195 N.C. App. ——, 671 S.E.2d 559 (2009), reversing and remanding a judgment entered on 16 October 2007 by Judge Jack A. Thompson in Superior Court, Johnston County. Heard in the Supreme Court on 8 September 2009.

*Woodruff, Reece & Fortner, by Gordon C. Woodruff and Mary McCullers Reece, for plaintiff-appellees.*

*Pendergrass Law Firm, PLLC, by James K. Pendergrass, Jr., for defendant-appellants Timothy and Shelley Schultz, Jerry Halbrook, and State Farm Bank, F.S.B.*

*Katherine Jean, Counsel, and David R. Johnson, Deputy Counsel, for North Carolina State Bar, amicus curiae.*

*Horack Talley Pharr & Lowndes, P.A., by Robert B. McNeill and Phillip E. Lewis, for North Carolina Land Title Association, amicus curiae.*

MARTIN, Justice.

This appeal presents the question of how North Carolina law allocates the risk of loss between a buyer and a seller when the closing attorney in a residential real estate transaction embezzles the sales proceeds. We conclude that in most residential closings buyers possess practical advantages over sellers in terms of protecting themselves from attorney misconduct. Therefore, under principles of equity recognized by this Court as early as 1875, buyers must bear the risk of such losses.

The facts of the instant appeal arise from a real estate transaction involving William and Suzanne Johnson (sellers or plaintiffs) and Timothy and Shelley Schultz (buyers). On 17 November 2005, buyers

contracted to purchase sellers' home in Benson, North Carolina for $277,500. Buyers hired attorney Donald Parker to represent them during the closing process. On behalf of buyers, Parker searched the title to the property, obtained title insurance, prepared and recorded a power of attorney, prepared the closing documents, and conducted the closing. Sellers were familiar with Parker from past dealings and paid him $125 to prepare a deed to the property. On 3 January 2006, the parties closed the transaction at Parker's law office.

To help pay for the property, buyers financed $200,320.24 from State Farm Bank (the Bank). On the day of closing, the Bank wired this money to Parker's trust account. Buyers paid the remaining balance from their personal funds. On 3 January 2006 at 4:46 p.m., Parker recorded the general warranty deed and the deed of trust. Thereafter, Parker tendered sellers a check drawn from his trust account for the net proceeds of the sale. When sellers attempted to cash Parker's check in May 2006, it was returned to them marked "NSF" for non-sufficient funds. The State Bar's subsequent investigation revealed that Parker had embezzled the closing proceeds on 4 January 2006.

On 13 July 2006, sellers filed a complaint against buyers, Parker, Jerry Halbrook as trustee under the deed of trust, and the Bank (defendants). Sellers filed an amended complaint against defendants on 20 July 2007 asking the trial court to set aside the conveyance of property and revert fee title back to sellers. In the alternative, sellers requested $277,500 in monetary damages. All defendants except for Parker—who admitted all allegations in the complaint—moved for summary judgment. The trial court ultimately concluded that sellers must bear the risk of loss since they were entitled to the sales proceeds at the time of the embezzlement. The trial court granted defendants' summary judgment motion, and sellers appealed.

The Court of Appeals, in a divided opinion, reversed the trial court's grant of summary judgment in favor of defendants. *Johnson v. Schultz*, 195 N.C. App. ——, 671 S.E.2d 559 (2009). The Court of Appeals concluded that placing the risk of loss on buyers is "not only more consistent with how residential real estate transactions are generally closed in this state, but also produces a more equitable result." *Id.* at ——, 671 S.E.2d at 566. Since the trial court did not consider whether Parker acted as sellers' attorney—a disputed issue of fact— the Court of Appeals remanded the case with instructions for the trial court to consider this issue to determine if sellers must share in the loss. *Id.* at ——, 671 S.E.2d at 570.

Before turning to the merits of this appeal, we briefly address two preliminary issues. First, we observe that the parties utilized the settlement method rather than the escrow method at closing. All three judges at the Court of Appeals agreed on this point, and the majority opinion describes both closing methods in detail. *Id.* at ——, 671 S.E.2d at 563-64. Second, because the parties did not engage in an escrow closing, the entitlement rule applied in *GE Capital Mortgage Services, Inc. v. Avent*, 114 N.C. App. 430, 442 S.E.2d 98 (1994), is not applicable to the present case. The entitlement rule provides an equitable framework for placing losses during escrow transactions on "the party who was entitled to the property at the time of the . . . embezzlement." *Id.* at 432, 442 S.E.2d at 100. *Avent* applied the entitlement rule to an escrow method closing, *id.*, and we decline to extend it to settlement method closings.

Having resolved these preliminary issues, we now turn to principles of equity that have been applied under North Carolina jurisprudence to allocate losses between innocent parties. The court in *Avent* stated that its application of the entitlement rule was "consistent with the equitable principle that where one of two persons must suffer loss by the fraud or misconduct of a third person, he who first reposes the confidence or by his negligent conduct made it possible for the loss to occur, must bear the loss." 114 N.C. App. at 435, 442 S.E.2d at 101 (internal quotation marks omitted) (quoting *Zimmerman v. Hogg & Allen, P.A.*, 286 N.C. 24, 30, 209 S.E.2d 795, 799 (1974) (alterations in original) (citations omitted)). Thus, while the entitlement rule is limited to escrow closings, there are no similar restrictions on the broader equitable principle underlying the *Avent* decision.

As early as 1875, this Court declared that "no principle of equity is better established than that where one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss, must sustain it." *State ex rel. Barnes v. Lewis*, 73 N.C. 138, 144 (1875). This equitable maxim is not unique to this jurisdiction and is a foundational principle of American common law. *See, e.g., Eliason v. Wilborn*, 281 U.S. 457, 462, 74 L. Ed. 962, 967 (1930) ("As between two innocent persons[,] one of whom must suffer the consequence of a breach of trust[,] the one who made it possible by his act of confidence must bear the loss."); 1 William Lawrence Clark & Henry H. Skyles, *A Treatise on the Law of Agency* § 493, at 1070 (1905) ("[W]here one or two innocent persons must suffer from the agent's wrongful act, it is just and reasonable that the

principal, who has put it in the agent's power to commit such wrong, should bear the loss, rather than the innocent third person." (citations omitted)); 2 John Norton Pomeroy, *Equity Jurisprudence* § 363, at 9 (Spencer W. Symons ed., 5th ed. 1941) (" 'He who trusts most must lose most.' " (citations omitted)).

A principal is typically only responsible "to third parties for injuries resulting from the fraud of his agent committed during the existence of the agency and within the scope of the agent's actual or apparent authority from the principal." *Norburn v. Mackie,* 262 N.C. 16, 23, 136 S.E.2d 279, 284 (1964) (citations omitted). In the present case there is no evidence that Parker acted within the scope of his actual or apparent authority when he embezzled the sales proceeds.

Even where the law of agency does not apply, however, equitable principles continue to operate. *See Goode v. Hawkins,* 17 N.C. 317, 319, 17 N.C. 393, 396-97 (1833) ("No one can [in equity] be permitted to set up a benefit derived through the fraud of another, although he may not have had a personal agency in the imposition." (citation omitted)). Thus, while agency law does not require the principal to absorb losses caused by actions outside the agent's authority, equity may nonetheless place these losses on the party "who first repose[d] the confidence, or by his negligent conduct made it possible for the loss to occur." *Wilmington & Weldon R.R., Co. v. Kitchin,* 91 N.C. 39, 44 (1884) (citing, *inter alia, Barnes,* 73 N.C. 138).

To determine which party reposed confidence in Parker, we must consider the customary procedures for closing real estate transactions in North Carolina. Although both parties in a residential real estate closing are free to hire their own attorney, "[t]he most common practice is for the closing attorney to represent the purchaser and lender while performing limited functions for the seller (such as the preparation of the deed)." Patrick K. Hetrick, Larry A. Outlaw & Patricia A. Moylan, N.C. Real Estate Comm'n, *North Carolina Real Estate Manual* 508 (2008-2009 ed.) (italics omitted) [hereinafter *North Carolina Real Estate Manual*]. In fact, the State Bar instructs that the closing attorney "may prepare the deed as an accommodation to the needs of her client, the buyer, without becoming the lawyer for Seller." N.C. St. B. Formal Ethics Op. 10 (July 14, 2005), *reprinted in North Carolina State Bar Lawyer's Handbook 2008*, at 317 (2008) [hereinafter Ethics Opinion]. Moreover, the buyer's attorney usually "handles or coordinates the closing, prepares the closing

JOHNSON v. SCHULTZ

[364 N.C. 90 (2010)]

statement(s), and disburses funds." *North Carolina Real Estate Manual* 509.

Because of these customary procedures for residential real estate closings, buyers have recourse to actionable legal claims not available to sellers. By embezzling the funds provided for the purchase of sellers' home, Parker breached fiduciary duties he undertook on behalf of buyers. Buyers also maintain the possibility of recovering a portion of their loss from the Client Security Fund of the North Carolina State Bar (CSF). The CSF reimburses "clients who have suffered financial loss as the result of dishonest conduct of lawyers engaged in the private practice of law in North Carolina." 27 NCAC 1D .1401(a) (Dec. 8, 1994). Accordingly, "it has been regarded as more appropriate for costs flowing from a lawyer's misconduct generally to be borne by the client rather than by an innocent third person." Restatement (Third) of the Law Governing Lawyers § 26 cmt. b (2000).

Furthermore, in a typical residential real estate transaction, closing protection letters place buyers in a better position than sellers to bear any losses that result from attorney misconduct. Closing protection letters, which are usually made available by title insurance companies, protect buyers from closing defects that affect the status of title. *See* 2 James A. Webster, Jr., *Webster's Real Estate Law in North Carolina* § 27-10, at 1195 (Patrick K. Hetrick & James B. McLaughlin, Jr. eds., 5th ed. 1999). More particularly, "closing protection service . . . covers losses suffered due to the fraud or dishonesty of the . . . approved attorney in the handling of the protected party's funds or documents in connection with the closing." *Id.* at 1195. Notably, this coverage can only be obtained by "a purchaser, lessee, or lender." *Id.* at 1194. As a result, while insurance coverage is normally an irrelevant inquiry when allocating losses between parties, we find it significant that the market as a whole allows buyers to protect themselves through a means entirely unavailable to sellers. This fact provides further indication that, at least in a typical transaction, buyers are better positioned than sellers to recover losses caused by a dishonest closing attorney.

Although buyers observe that sellers chose not to accept cash or some other surer method of payment, we do not believe the loss here should fall on sellers simply because they adhered to the nearly universal practice of accepting a check drawn from the closing attorney's trust account. *See North Carolina Real Estate Manual* 524 ("The attorney will deposit all funds paid by the purchaser into his

trust account and then will make all required disbursements from the trust account."). As an initial proposition, we are unwilling to accept the consequences likely to result if the standard of practice would require lawyers to possess and disburse tens of thousands of dollars in cash at real estate closings. Moreover, as noted by the Court of Appeals, "shifting the risk of loss based merely on the form of payment the seller accepts would significantly disrupt the way residential real estate closings are handled under our current system." *Johnson v. Schultz*, 195 N.C. App. at ——, 671 S.E.2d at 568-69. Rather, equity dictates that the loss should lie with the party "who first repose[d] the confidence, or by his negligent conduct made it possible for the loss to occur." *Kitchin*, 91 N.C. at 44. Given that the parties here followed the customary procedures in this state for closing residential real estate transactions, we conclude that buyers reposed confidence in Parker as their closing attorney.

In summary, after considering the procedures customarily used for residential real estate closings and applying long-standing principles of equity, we hold that buyers must bear the loss caused by the misconduct of their own retained attorney. We stress that it is the buyer alone in most residential real estate transactions who is legally deemed to repose confidence in the closing attorney through the existence of the attorney-client relationship. In the present case, however, there is evidence that in addition to paying Parker $125 to prepare a deed to the property, sellers had a prior relationship with him. Thus, a factual inquiry must be conducted to determine whether Parker also represented sellers during the closing process. Therefore, we remand this case to the trial court to determine if an attorney-client relationship existed between sellers and Parker.

To determine whether an attorney-client relationship in fact existed between sellers and Parker, the trial court should consider the guidance offered in the Ethics Opinion as to how a closing attorney "may prepare the deed as an accommodation to the needs of her client, the buyer, without becoming the lawyer for Seller." To avoid establishment of an attorney-client relationship, the Ethics Opinion instructs lawyers to make certain clarifications and disclosures about their role in the transaction as well as to abstain from giving the seller legal advice. *Id.* On remand, we instruct the trial court to consider these factors and determine whether Parker, as closing attorney, exceeded the ethical safe harbor in the Ethics Opinion and established an attorney-client relationship with sellers.

To be sure, Parker's misconduct has adversely affected all parties to this proceeding. Although lawyers rarely embezzle closing proceeds, such misconduct has a devastating effect on the party who is ultimately left to incur the loss.[1] While the General Assembly enacted legislation holding settlement agents responsible for a loss liable for "actual damages plus reasonable attorneys' fees" and further requires payment to the injured party of "an amount equal to one thousand dollars ($1,000) or double the amount of interest payable on any loan for the first 60 days after the loan closing," N.C.G.S. § 45A-7 (2009), this statute provides little or no protection when the embezzler is judgment proof.[2]

For the reasons stated, we affirm the decision of the Court of Appeals. We remand this case to the Court of Appeals for further remand to the trial court for further proceedings not inconsistent with this opinion.

AFFIRMED.

Justice TIMMONS-GOODSON dissenting.

The majority holds for the first time that innocent buyers in a residential real estate transaction, by virtue of their mere employment of a closing attorney, are liable for the sellers' loss arising from the active malfeasance of the closing attorney. The majority explains that this result is equitable because the buyers are more likely to have insurance. Because the majority's decision inflicts incalculable damage upon the settled law of agency and violates the general rule that prohibits consideration of insurance coverage in determining liability, I respectfully dissent.

It is well established in North Carolina that an attorney-client relationship is based upon principles of agency. *E.g.*, *Dunkley v. Shoemate*, 350 N.C. 573, 577, 515 S.E.2d 442, 444 (1999). A universal rule of agency provides that a principal may not be held liable for the torts of his agent unless the agent's act is (1) expressly authorized by the principal, (2) committed within the scope of his employment and

---

1. The CSF provides no guarantee of complete relief as it is a discretionary fund that caps recovery sustained by an applicant due to the conduct of one attorney at $100,000. 27 NCAC 1D .1418 (e), (g) (Mar. 6, 1997).

2. The approach used in Virginia ensures that victimized parties are made whole, even if the embezzler is judgment proof. *See* Va. Code Ann. § 6.1-2.21(D) (1999) (requiring settlement agents to maintain malpractice insurance, blanket fidelity bonds or employee dishonesty insurance policies, and surety bonds).

in furtherance of the principal's business, or (3) ratified by the principal. *See, e.g., Snow v. DeButts*, 212 N.C. 120, 122, 193 S.E. 224, 226 (1937). Mere employment of an agent is insufficient to impose liability upon the principal for the agent's wrongful acts committed outside the scope of employment. *See id.* at 122-24, 193 S.E. at 226-27; *Salmon v. Pearce*, 223 N.C. 587, 589, 27 S.E.2d 647, 649 (1943) (citations omitted).

Clearly, the acts of embezzlement by attorney Parker far exceeded the scope of his employment or any apparent or actual authority invested in him by either party, and the majority concedes as much. The majority nevertheless determines that the innocent buyers may be held liable for their employment of Parker under the principle that " '[w]here one of two persons must suffer loss by the fraud or misconduct of a third person, he who first reposes the confidence, or by his negligent conduct made it possible for the loss to occur, must bear the loss.' " *Virginia-Carolina Joint Stock Land Bank v. Liles*, 197 N.C. 413, 418, 149 S.E. 377, 379 (1929) (quoting *Wilmington & Weldon R.R. Co. v. Kitchin*, 91 N.C. 39, 44 (1884)). This principle, taken out of context and presented without analysis by the majority, may perhaps appear at first blush to support the majority's proposition that an innocent, non-negligent party may be nonetheless held liable for the malfeasance of an agent. Careful examination of the legal precedent, however, including all the cases relied upon by the majority, quickly reveals that the principle is simply inapplicable to the facts of the present case.

The principle[3] that when one of two persons must suffer loss by the misconduct of a third party, the person who "first reposes the confidence, or by his negligent conduct made it possible for the loss to occur, must bear the loss," *id.*, is generally regarded as a principle of apparent authority under the law of agency. *See, e.g., Investors Title Ins. Co. v. Herzig*, 320 N.C. 770, 774, 360 S.E.2d 786, 789 (1987) (stating that "this Court has held with respect to apparent authority that where one of two persons must suffer loss by the fraud or misconduct of a third person, he who first reposes the confidence or by his negligent conduct made it possible for the loss to occur, must bear the loss") (citing, *inter alia, Zimmerman v. Hogg & Allen, P.A.*, 286 N.C. 24, 30, 209 S.E.2d 795, 799 (1974) (discussing apparent authority)); *Kitchin*, 91 N.C. at 44-45 (holding the principals liable for the fraud of their agent who acted with apparent authority);

---

3. I refer hereafter to this principle as the "innocence principle" for ease of reading.

Robert E. Lee, *North Carolina Law of Agency and Partnership* § 57, at 73 (6th ed. 1977) (discussing the "innocence principle" as one of apparent authority).

Under apparent authority, a principal may be held liable for the misconduct of his agent if the agent acts within the scope of his apparent authority and the innocent third party has no notice of the limitation of the authority. *See, e.g., Zimmerman,* 286 N.C. at 30-31, 209 S.E.2d at 799; 1 William Lawrence Clark & Henry H. Skyles, *Law of Agency* § 493, at 1070-71 (1905) (relating that a principal is bound by even the wrongful acts of his agent as long as the agent was "acting at the time for the principal, and within the scope of the business intrusted to him"). Here, there is no contention that Parker acted with any real or apparent authority when he embezzled the sales proceeds. Thus, the "innocence principle," as a principle of apparent authority, does not apply to the circumstances presented by the instant case.

The "innocence principle" is also sometimes invoked by courts in cases in which the direct loss to one of the parties has been caused by the misconduct of a third party who may not technically be the agent of one of the parties, but whose misconduct was nevertheless somehow enabled by one of the parties. In such cases, one of the parties will invariably be found to be "less innocent", that is, negligent in some manner:

> The maxim is often put in the form of "one of two *equally* innocent parties," etc.; but . . . it is clear that, in general, there is no reason for preferring one of two equally innocent parties, and the loss must in general lie where it has fallen. It seems perfectly clear that the incidence of the loss can only be shifted where the parties were *not* equally innocent, and that, before the loss can be thrown upon the principal, he must be shown to have been guilty of some misconduct,—that his conduct must have contributed in some way, which reasonable care would have avoided, to the perpetration of the wrong. Certainly the mere employment of an agent in the ordinary way is not such misconduct, unless we are prepared to say that one avails himself of this common, useful and supposedly lawful instrumentality at his risk, and this has not hitherto been deemed to be the law.

1 Floyd R. Mechem, *Law of Agency* § 749, at 532 (2d ed. 1914) [hereinafter "*Mechem*"].

The cases relied upon by the majority perfectly illustrate the truth of Professor Mechem's observations. For example, in *State ex rel. Barnes v. Lewis*, 73 N.C. 138 (1875), the State of North Carolina, acting on behalf of the estate of the plaintiff ward, brought a civil action against the defendant as surety to the bond given by the proposed guardian of the ward's estate. *Id.* at 138. The guardian wasted the ward's property and then died insolvent. *Id.* at 144. The Court determined that the defendant surety "fail[ed] to use ordinary caution either to protect himself or to protect the relator" which was "[c]learly . . . negligen[t]." *Id.* By his negligence, the defendant enabled the misconduct of the guardian. The Court declared that: "No fraud is imputed to the defendant: but no principle of equity is better established than that where one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss, must sustain it." *Id.* Thus, although the Court in *Barnes* declared the defendant innocent of actual *fraud*, the defendant was clearly negligent and thereby liable. Hence, the defendant in *Barnes* was not truly "innocent," but instead enabled the misconduct of the third party through his negligence and was properly held accountable for such negligence.

Similarly, the plaintiffs in *Eliason v. Wilborn*, 281 U.S. 457, 74 L. Ed. 962 (1930), negligently entrusted a certificate of title to a third person, Napletone, who through forgery then fraudulently obtained a new certificate of title in himself, and subsequently sold the new certificate of title to innocent buyers. *See id.* at 458, 74 L. Ed. at 965. The plaintiffs sought cancellation of the deed and certificates issued to the innocent buyers. The United States Supreme Court stated that, "[a]s between two innocent persons one of whom must suffer the consequence of a breach of trust the one who made it possible by his act of confidence must bear the loss." *Id.* at 462, 74 L. Ed. at 967. Because the plaintiffs "saw fit to entrust [the certificate of title] to Napletone . . . they took the risk," *id.* at 461, 74 L. Ed. at 967, and the Court affirmed judgment for the buyers, *id.* at 452, 74 L. Ed. at 967. Thus, as was the case in *Barnes*, the Court was not faced with two truly "innocent" parties, but determined rather that the plaintiffs' "conduct . . . contributed in some way, which reasonable care would have avoided, to the perpetration of the wrong." 1 *Mechem* § 749, at 532.

The case of *Bank v. Liles* is also instructive. In *Liles* the plaintiff-bank brought suit to recover a $4500 loan to the defendant-borrowers. 197 N.C. at 414, 149 S.E. at 377. The note was secured by

**JOHNSON v. SCHULTZ**

[364 N.C. 90 (2010)]

a deed of trust on property that the defendants warranted was unencumbered. *Id.* The property was, however, encumbered by another lien. *Id.* The plaintiff-bank executed the loan by issuing a check payable to the defendants and their attorney. The defendants endorsed the check over to the attorney with directions for him to pay the balance on the prior lien, but instead the attorney absconded. 197 N.C. at 415-16, 149 S.E. at 378. In reviewing the case, this Court recited the "innocence principle" and determined that the defendants were required to bear the loss because they were "negligent, and there was a lack of due care on [their] part, in trusting [the attorney]" and because they "had the opportunity of protecting themselves, and failed to do so, by the check being made payable to the order of both." *Id.* at 418, 149 S.E. at 379. Thus, the Court in *Liles* made it clear that the defendants' liability arose through negligence, rather than their mere employment of the malfeasant attorney.

In the instant case, unlike the situation in *Barnes, Eliason,* and *Liles,* we are faced with the unfortunate reality of two completely innocent—that is, non-negligent parties. Buyers had no reason to mistrust Parker, had no opportunity to prevent Parker's misconduct, and did nothing to enable the embezzlement. In short, there was no lack of due care on the part of buyers. Buyers did nothing other than employ Parker to conduct the closing, and mere employment of an agent is insufficient to impose liability upon the principal for the agent's wrongful acts. *See Salmon,* 223 N.C. at 589, 27 S.E.2d at 649; *Snow,* 212 N.C. at 122-24, 193 S.E. at 226-27. Accordingly, the loss sustained by sellers cannot be shifted to buyers and must "lie where it has fallen." 1 *Mechem* § 749, at 532.

Although the majority expressly recognizes that "agency law does not require the principal to absorb losses caused by actions outside the agent's authority," the majority nevertheless determines that buyers may be held liable for Parker's malfeasance because they "reposed confidence in Parker." This is true with every principal-agent relationship, however. Under the majority's reasoning, innocent, non-negligent principals may now be held liable to third persons for the misconduct of their agents, even if the misconduct exceeds the scope of employment. This has never before been the law in North Carolina and should not be so now.

Unable to cite to any authority that supports its reasoning, the majority concludes that buyers should be held responsible for sellers' loss because "buyers are normally in a better position than sellers to bear the loss that results from embezzlement by the closing attor-

N.C. INS. GUAR. ASS'N v. BOARD OF TR. OF GUILFORD TECHNICAL CMTY. COLL.

[364 N.C. 102 (2010)]

ney." Buyers are better positioned to sustain the loss, the majority asserts, because of the availability of insurance coverage to buyers. This Court has long held, however, that evidence of insurance coverage is irrelevant to the substantive inquiry of a case. *E.g.*, *Fincher v. Rhyne*, 266 N.C. 64, 68-69, 145 S.E.2d 316, 318-19 (1965); *Keller v. Caldwell Furn. Co.*, 199 N.C. 413, 415-16, 154 S.E. 674, 676 (1930). The majority's decision to base buyers' liability on the availability of insurance completely contradicts this nearly universal rule. I therefore disagree that equity requires buyers to absorb sellers' loss.

I strongly believe that buyers' liability must be premised on something more than general notions of equity that "seem[] to be resorted to only to cover loose reasoning or to span a gap without noticing it." 2 *Mechem* § 1986, at 1552. Because sellers fail to show that buyers in any manner contributed or enabled the theft of the sales proceeds by Parker, sellers cannot shift their loss to buyers, and the loss must "lie where it has fallen." 1 *Mechem* § 749, at 532. I recognize that this is a difficult case, but "we cannot break into well-settled principles of law in hard cases. If we did, we would have no orderly system, and law would be a 'rope of sand.' " *Liles*, 197 N.C. at 417, 149 S.E. at 379. Therefore, I respectfully dissent.

Justice HUDSON joins in this dissenting opinion.